## 11961

SANDERS v. COMMONWEALTH LIFE INS. CO. OF KENTUCKY

(132 S. E., 828)

1. EVIDENCE—TESTIMONY BY BENEFICIARY OF CONVERSATION HAD AFTER INSURED'S DEATH WITH AUTHORIZED AGENT OF INSURER HELD ADMISSIBLE IN ACTION ON POLICY.—In action on life policy, testimony of beneficiary as to conversation he had after insured's death with one shown to be duly authorized agent of insurer and acting within scope of authority at time of conversation *held* admissible.

2. EVIDENCE—REFUSING TO PERMIT WITNESSES WHO HAD SEEN INSURED'S DEAD BODY TO GIVE OPINION AS TO MANNER OF DEATH HELD PROPER, BEING QUESTION FOR JURY, WHERE ONLY MATTER UNDER INVESTIGATION WAS WHETHER INSURED DIED BY HIS OWN HAND.—Refusal to permit witnesses, who had seen dead body of insured and made investigation of circumstances of death, to give expression of opinions, *held* proper, where matter under investigation

---

NOTE: As to presumption with respect to suicide of an insured person, see note in 35 L. R. A., 258.

was whether or not insured died by his own hand, it being question for the jury.

3. INSURANCE—RULING AS INCOMPETENT QUESTION AS TO SUICIDE OF BETWEEN THAT AND $5,000 POLICY WOULD GO TO INSURED'S WIFE action on life policy, ruling, as incompetent, question relative to suicide of brother of insured, *held* proper.

4. INSURANCE—PERMITTING BENEFICIARY, WHO WAS BROTHER OF INSURED, TO TESTIFY THAT INSURED OWED HIM $2,500, AND DIFFERENCE BETWEEN THAT AND $5,000 POLICY WOULD GO TO INSURED'S WIFE AND CHILDREN, HELD PROPER AS EXPLAINING HOW POLICY WAS MADE IN HIS FAVOR.—In action on life insurance policy, where beneficiary was brother of insured, admitting testimony of beneficiary that insured was indebted to him for $2,500, and balance between that and policy of $5,000 would go to insured's wife and children, *held* proper as explaining how policy was made in his favor as beneficiary.

5. TRIAL—REMARK OF JUDGE DURING TRIAL THAT POLICY WAS MADE TO INSURED'S BROTHER, AND HE WAS ENTITLED TO EVERY CENT OF IT, MADE AS CONSTRUCTION OF POLICY, HELD NOT CHARGING ON FACTS, WHERE ONLY DISPUTE WAS WHETHER INSURED COMMITTED SUICIDE.— In action on life insurance policy, where only dispute was whether or not insured committed suicide, remark of Judge, when looking at policy, that it was made out to insured's brother and he was entitled to every cent of it, *held* not charging on the facts; it being simply his construction of policy.

6. APPEAL AND ERROR—SUPREME COURT DOES NOT ACT AS JURY, BUT RATHER IS FORBIDDEN TO TAKE SUCH POWERS, DUTIES, RIGHTS, AND PRIVILEGES.—Members of Supreme Court are not required in law case to act in capacity of jurors, but rather are forbidden to take upon themselves powers, duties, rights, and privileges of jury.

7. APPEAL AND ERROR.—Where jury's verdict was approved by trial Judge, burden is on appellant to show that testimony was insufficient.

8. INSURANCE.—Burden is on insurer to show that insured violated terms of policy by act of self-destruction.

9. INSURANCE—EVIDENCE HELD TO WARRANT JUDGE IN SUBMITTING CASE TO JURY ON ISSUE OF INSURED'S SUICIDE.—In action on life insurance policy, evidence *held* to warrant judge in submitting case to jury on issue as to whether insured committed suicide.

10. APPEAL AND ERROR—REFUSING OR GRANTING NEW TRIAL IS LARGELY WITHIN DISCRETION OF TRIAL JUDGE, AND HIS FINDING WILL NOT BE DISTURBED UNLESS IT CLEARLY APPEARS THAT DISCRETION WAS ABUSED.—Matter of granting or refusing new trial on ground of insufficiency of evidence is largely within discretion of trial Judge,

and Supreme Court will not disturb his finding unless it clearly appears as matter of law that discretion was abused.

11. APPEAL AND ERROR.—Appellant has burden of showing abuse of discretion of trial Judge in refusing new trial on ground of insufficiency of evidence.

Before SEASE, J., Union, May, 1924.    Affirmed.

Action by C. C. Sanders against the Commonwealth Life Insurance Company of Kentucky.    Judgment for plaintiff, and defendant appeals.

*Messrs. Barron, Barron & Barron,* for appellant, cite: *Presumption against suicide:* 112 S. C., 337; 127 U. S., 662. *Where suicide is only logical inference to be drawn from evidence directed verdict proper:* 124 S. C., 400; 93 S. C., 300; 205 N. Y. S., 505; 112 S. E., 383. *Remark of Court in passing on admissibility of testimony may amount to charge on facts:* 87 S. C., 245; 81 S. C., 479.

*Mr. J. Gordon Hughes,* for respondent, cites: *Admissions in pais by agent of corporation admissible:* 77 S. C., 187; 57 S. E., 766. *Statements of agent admissible as evidence of waiver of conditions of policy:* 83 S. C., 13; 64 S. E., 859. *Court will eliminate incompetent portions of depositions offered in evidence:* 102 S. C., 142; 86 S. E., 483. *Presumption against suicide:* 112 S. C., 336; 99 S. E., 806; 12 Ga. App., 855; 78 S. E., 1115; 168 N. C., 87; 83 S. E., 16. *Burden on insurer to establish suicide by preponderance of evidence:* 213 S. W., 45; 7 A. L. R., 1214; 115 Va., 398; 79 S. E., 401. *Question of suicide properly left to jury:* 112 S. C., 337.

April 16, 1926.

The opinion of the Court was rendered by MR. JUSTICE BLEASE.

This action was brought by the plaintiff, as beneficiary, against the defendant in the Court of Common Pleas for Union County upon a policy of insurance issued upon the

life of J. Walter Sanders, brother of plaintiff. The sole defense was that the terms of the policy were avoided by the suicide of the insured within one year of the date of the execution and delivery of the policy. Defendant conceded that the premium paid should be returned, and offered to allow a verdict to be taken against itself for that sum. The verdict was ,for the plaintiff for the full amount of the policy and interest. The defendant has appealed to this Court upon exceptions hereinafter referred to.

The first exception alleges error on the part of the Circuit Judge in permitting the plaintiff, when a witness, to testify in direct examination, over defendant's objection, to a conversation he had, after the death of the insured, with D. G. Roach. The appellant contends that statements made by Roach to the witness were inadmissible because there was no proper proof that Roach, at the time of the conversation, testified to by the witness, was acting within the scope of his authority and duties as agent of the defendant. The record shows that the Circuit Judge was exceedingly careful to require sufficient proof that Roach was the duly authorized agent of the defendant, and that he was acting at the time of the conversation, repeated by the witness, within the scope of his authority and duties, and we think the testimony was clearly admissible.

Exceptions 2, 3, 4, 5 and 6 will be considered together, as they relate to the same subject. These exceptions question the refusal of the presiding Judge to permit witnesses, who had seen the dead body of the deceased and who had made investigation of the circumstances of his death, to give expression to their opinions as to how he came to his death. The only real matter under investigation in the trial was whether or not the deceased died from his own hand or other cause. That question was absolutely one for the jury. The Court was right in refusing to allow the opinion testimony which the defendant sought to bring out.

It is charged in the seventh exception that the trial Judge erred in ruling as incompetent a question asked of one of the witnesses as to the suicide of a brother of the insured.   In the examination of the witness, counsel for the defendant practically conceded at the time he asked the question that the same was incompetent.   Under all the circumstances, it is our opinion that the Circuit Judge was right in sustaining the objection to the question.   To have gone into that matter would have practically necessitated trial of another cause, if the alleged suicide of the brother was denied.

While the plaintiff was being examined as a witness, it developed that although the policy sued upon was for the sum of $5,000, the insured was indebted to the plaintiff only in the sum of $2,500.   The plaintiff was asked as to who was to get the benefit of the balance of the amount of the policy above the debt from the insured to him, and he replied, "his wife and children."   Counsel for the defendant said: "Don't go into that."   The witness then remarked: "I don't want a dollar of it.   I am going to give it to his wife and children."   The Circuit Judge, evidently, looking at the policy, which it was his duty to construe, made the following remark:   "It is made to C. C. Sanders, and he is entitled to every cent of it under the law legally.   I was thinking it was made to his estate."   This incident is made the basis of each of Exceptions 8 and 9.

No proper objection was entered to the testimony mentioned.   Nevertheless we think the testimony was competent, and the admission thereof was in the discretion of the presiding Judge, in that the witness was at the time explaining how it happened that the policy of insurance was made in his favor as beneficiary and was not made payable to the wife and children of the insured.

The statement made by the presiding Judge, to which complaint is made, was not in violation of the constitutional provision as to charging on the facts.

The one disputed matter before the Court was whether or
not the deceased did commit suicide.   The policy was made
payable to the plaintiff, and if he was entitled to any amount
therefrom, he was entitled. to "every cent of it under the
law legally."   The defendant admitted so much.   The re-
mark of the Circuit Judge was simply his construction that,
under the terms of the policy, if anything was due thereon
the whole amount was due to the plaintiff, and no part was
due to any other party, and this interpretation was correct.

The remaining exceptions, and those which have been
argued most ably and forcibly before this Court, pertain to
the refusal of the Court to direct a verdict as asked for by
the defendant, and to grant a new trial of the cause.   The
request for a directed verdict was based upon the conten-
tion that all the evidence showed that the insured had com-
mitted suicide within one year from the date of the policy,
and that thereby its terms had been violated.   The ground
upon which a new trial was asked was that the verdict was
against the overwhelming weight of the evidence.   We are
frank to admit that if one will read carefully all the testi-
mony, just as it appears in plain black print in the record
before us, there is some reason for the belief that the in-
sured may have committed suicide.   To some it may appear
that the preponderance of the evidence was in favor of the
defendant's contention.   That is only a question for argu-
ment, and there are grounds for the advancement of two
or more theories as to how the insured died.

The members of this Court are not required in a law
case to act in the capacity of jurors.   The law does
not impose that duty upon us.   To the contrary, the
law rather forbids this Court assuming to take upon itself
the powers, duties, rights, and privileges of a jury.   In a
cause of this kind, a Judge of the Court of Common Pleas
of this State has certain duties to perform, and certain au-
thority is given to him to see that justice is administered.
It is the duty of a Circuit Judge, upon certain occasions, to

direct a verdict.  More often, it is his duty to refuse to make such direction.  Jurors, in our Courts, have specific duties thrust upon them, and they are bound by their oaths to perform these duties in a fearless, honest, and impartial manner.  If a Circuit Judge, who has heard the evidence in a case, believes that a jury has rendered an improper verdict, the power is placed in him to set that verdict aside, and in a proper instance it becomes his duty to exercise that power.  The Court will assume that jurors have endeavored to faithfully discharge the arduous duties imposed upon them, to render honest verdicts, just as it will likewise be assumed that the Judges of the Courts have sought to prevent wrong and injustice from being done by jurors.  For hundreds of years the Courts of this State, including our highest tribunal, have recognized the sovereign power of a jury of the people.  One of the foundation-stones of our government is our time-honored jury system, and it is our duty to uphold it.  To deny the oft-repeated statement that jurors have sometimes rendered erroneous verdicts would be absurd.  But it must be remembered, too, that Judges have committed error just as often as jurors have made mistakes.  It is the duty of a juror to respect and to yield to the instructions of a Judge as to matters of law.  And the Judges of all the Courts should be ever mindful of the rights and duties of juries in determining questions of fact.  As far back as 1798, in an action of trespass to try title to a tract of land, although a new trial of the case was ordered on the theory that another jury should try the cause because the former jury may have heard too much of the case, and for the reason that the defendant should be allowed two trials, which right was always given the plaintiff in actions of that kind, the distinguished reporter, Elihu Hall Bay, one of the Judges of the Court, makes this report on what the Judges unanimously said:

"The correct rule of law, in cases of this sort, they took to be this:  That wherever there was a total failure of

testimony or evidence offered to a jury in support of an action, there it was the duty of the Judge to order a nonsuit, because it would be a nugatory act to send such an unsupported cause to a jury. But wherever there was testimony, although of a doubtful nature, or a train of facts which were contradictory in themselves, or which admitted of different interpretations; in all such cases, the Court ought to send it to the jury, ultimately to determine between the parties." *Brown v. Frost,* 2 Bay, 126; 1 Am. Dec., 633.

The learned Judge, who reported this case, made the following observation by way of syllabus:

"Jurors are the constitutional judges of facts and circumstances, and it is not for the Court to infer that their verdicts are wrong, unless some rule of evidence or principle of law is violated."

Nearly a hundred years after the decision in *Brown v. Frost,* in 1883, our Supreme Court, citing that case as authority, used this language:

"There are some loose expressions in some of the cases to the effect that insufficient testimony will sustain a nonsuit. These expressions should not be understood, however, as giving power to the trial Judges to determine the quantum of testimony sufficient to prove an alleged fact, or to decide as to the truth, force, or effect of such testimony; but they should be interpreted in the sense rather of pertinency or relevancy. In fine, the rule is, that where there is any competent, pertinent, and relevant testimony offered to the facts in dispute, the case passes into the hands of the jury and beyond the Judge; but where no such testimony is offered, it is the province and duty of the Judge to nonsuit. Thus understood, the rule is clear and it harmonizes the respective functions of the Court and the jury, making our judicial system the complete and perfect system that it is; leaving the law to those who have made it a special study, and therefore better able to decide it (the Judges), and the

facts to those who, from their practical common sense, are perhaps best able to solve them (the jury)." *Davis v. Columbia & G. R. R. Co.,* 21 S. C., 93.

It is entirely useless to cite the hundreds of cases, decided by this Court, sustaining the views expressed in the two cases, almost a century apart in time, referred to above. Neither is there need to turn to books other than our own Reports to find judgments, decrees, decisions, and opinions agreeing with the principles announced by this Court. It cannot be well disputed that in all the states of the American Union, which have, in their respective Constitutions, provisions for jury trial similar to those contained in the Constitution of this State, that the right of a jury to pass upon questions of fact is highly regarded and sought to be preserved by those in judicial authority. This has been pointed out many times by our own Court, and recently Mr. Justice Marion, in *Ingram v. Davis,* 125 S. E., 920; 131 S. C., 326, cited 26 R. C. L., 1069, Par. 75, as authority for this statement:

"Even if defendant's evidence were not contradicted by other direct evidence, such lack of contradiction would not render it undisputed; and where the right to a jury trial is accorded by law, the function and duty of passing upon the credibility of witnesses and the accuracy of their testimony may very rarely be taken from the jury."

It must be assumed that the jurors who tried this cause were honest and impartial men, that they were of average intelligence, drawn from various occupations, and acquainted with human affairs and experiences. This jury, as well as the Circuit Judge, had given to them opportunities and advantages not permitted this Court. They could look into the faces of the witnesses before them; could see the expression in their eyes and countenances; could observe their bearings and movements, as they testified; they could watch the actions of the parties and their agents and employees; they could determine if a witness hesitated to speak when

he was being pressed for a truthful answer.  Sitting in this
Court, we can read in cold black type that a witness an-
swered "no" to a question, and, naturally, we will think
that his answer was a truthful expression; but twelve honest
jurors, with the eyes of each of them turned upon the wit-
ness, may honestly determine, and come to a right conclu-
sion, that a truthful answer would have been "yes."  Being
constantly reminded by attorneys in a cause of their duty
to render a righteous verdict, with the caution of a learned
and impartial presiding Judge to let their verdict speak the
truth ever before them, and knowing that many of their
fellow citizens would exercise their immemorial right to
criticize their verdict, whatever it might be, surely, at least
one of these twelve men would have refrained from agree-
ing to this verdict, unless there had been evidence to sustain
it.

The presiding Judge, with many years of experience
in his honored position, and trained by long service
thereto fore as a solicitor of this State in the art of
examining and cross-examining witnesses for the purpose
of eliciting from them truthful testimony, said there was
sufficient testimony to carry this case to the jury.  No com-
plaint of error is made in the law as given to the jury.
The few errors charged as to the admission of testimony
and as to refusal to admit have been easily dismissed as
being without merit.  The verdict of the jury has been ap-
proved by the trial Judge.  The burden is therefore clearly
upon the appellant to convince this Court that there was no
testimony adduced to show otherwise than that the insured
died by his own hand.

The record does disclose testimony tending to show that
the insured came to his death as a result of suicide, but at
every point this testimony is disputed.  There is evidence
that on the afternoon preceding his death, the insured was
under the influence of intoxicating liquors, but one witness
testified that when she saw him on this same afternoon he

did not appear to her to have been drinking. There was evidence that the insured was indebted to the insurance company, by which he was employed (not the defendant), and the insinuation, more than an accusation, was made that he was short in his accounts. The gentleman who directed the work of the insured, however, testified that this was but a trifling matter and could have easily been arranged, and that the work of the insured for the company was altogether satisfactory. There was testimony that the insured was jealous of attentions paid to "the woman in the case" by other men; but this woman, it was shown, claimed he was jealous without cause, and the proof is that their relations were friendly, if not intimate, even up to the time of the tragic ending of the life of the insured. So far as the record discloses, the first person who viewed the body of the insured after his death was the woman referred to. Soon after the death was discovered, she was arrested technically on the charge of having murdered the deceased. Almost all the testimony to prove the suicide theory comes from her. Her testimony abounds with contradictions, and it is evident that much of what she related was fabricated. Powder burns were found on the left hand of the deceased, indicating, it was stated, that he might have fired the pistol with that hand; but men who knew him well swore that he was a right-handed man. There was a dispute in the evidence as to whether or not the pistol found upon the body of the deceased was his own weapon. The main witness for the defendant, the woman referred to, claimed the deceased had been threatening to commit suicide for some two years, yet no other witness among his intimate friends knew of threats of this nature. She claimed also that after the death of the insured that she received, through the mail, a letter which he had written to her the night previous to the finding of his dead body, in which he told her of his intended act of suicide, and which letter contained a message he requested her to deliver to his wife; but she did not produce

this letter and was only able to prove by one other person, her own daughter, such an epistle had been in existence; and she did not deliver the message her dying friend requested her to give. This woman also testified that the insured wished to end his life because of conditions between himself on the one hand and members of his family, including his wife, children and brother, on the other hand; but there was much testimony to show that his relationship with all the members of his family was pleasant and agreeable. Her excuse for going to the room of the deceased in the early morning, when she found his body there, cold in death, was to get her eyeglasses, which the deceased had taken from her on the previous night for the purpose of having repaired; but the landlady, who saw her as she entered into the room of the deceased, testified that she had the glasses on at the time. The position in which the pistol was found may have indicated to the officers that the wound of the insured was self-inflicted, but it was in testimony that "the woman" had removed the pistol before the officers arrived upon the scene. Wearing apparel of the deceased, with apparent blood spots thereon, was found hidden away among the effects of the deceased in the room where he died, and this apparel was exhibited to the jury. We do not say—it would be unfair for us to do so—that the woman killed the deceased, or that he was killed by some other person to her knowledge; but the fact remains that there were strong suspicions directed toward her in connection with the death of the insured, and, in that situation, it was very natural for a woman of her evident character to endeavor to do all she could to show that suicide and not murder had been committed. It does seem rather strange, too, that a man, who was engaged for some years in the insurance business, who, undoubtedly, was well acquainted with the provisions of life insurance policies, who was threatening, according to the testimony of the woman, to commit suicide long before he obtained the policy sued on, would not have waited one

week longer to have destroyed himself when by so waiting there would have been no question about the beneficiary recovering the amount of the insurance.   The reputation for truth and veracity of the chief witness of the defendant to establish the suicide of the insured was attacked by the plaintiff, and the defendant offered no person to show that she was worthy of belief.

It is admitted, which admission is correct, that the burden was on the defendant to show that the insured violated the terms of the policy by his act of self-destruction.   It was not necessary for the plaintiff to show that the insured had been murdered, or that he had died from a wound accidentally inflicted by himself, or that he had died from natural causes.   The plaintiff, in the first instance, only had to show that the insured was dead.   The presumption was in favor of the plaintiff that the insured had not committed suicide, and it was the duty of the defendant to overcome this presumption by evidence.   Of course, if some one should be charged in a proper Court with the murder of the insured, the presumption of innocence would be thrown around the accused person.   In that instance, the law would require the guilt of the accused to be established beyond a reasonable doubt.   The rule as to proof in a civil case is different from that in a criminal case. It is possible under our law for a person charged with the murder of another to be acquitted because of the failure of the prosecution to establish guilt, as required by the law; and yet on the civil side of the Court, under the rule as to proof of facts, for another jury to decide that the deceased was murdered.

The Circuit Judge was clearly right in submitting the case to the jury for their determination.

The matter of granting or refusing a new trial on the ground that the preponderance of the evidence was in favor of the defendant was a matter largely within the discretion of the trial Judge, and we cannot dis-

turb his finding unless it clearly appears that as a matter of law that discretion was abused.

Ordinarily, this Court in passing upon the question if there was an abuse of the discretion of the trial Judge would not find it necessary to review the testimony in the case; but since it has been so strongly urged that the insured must have committed suicide, we have thought best to review, briefly, the evidence as it comes to us in the record on the appeal.

The burden is upon the appellant to show an abuse of the discretion on the part of the Circuit Judge. Following the principle laid down by Judge Bay in the case of *Brown v. Frost, supra,* this Court has no right to infer that the verdict of the jury was wrong, unless some rule of evidence or principle of law was violated. We have already held that the rules of evidence were properly observed. The appellant makes no question as to the principles of law involved. The facts in the case were left, under our law, to the jury, and this Court has said that these jurors, "from their practical common sense, are perhaps best able to solve" these facts. *Davis v. Railroad Co., supra.* The jury had the right to pass upon the credibility of the witnesses and the accuracy of their testimony. *Ingram v. Davis, supra.*

All the exceptions are overruled, and the judgment of the Court of Common Pleas of Union County is affirmed.

MESSRS. JUSTICES WATTS and STABLER concur.

MR. JUSTICE COTHRAN dissents.

MR. CHIEF JUSTICE GARY did not participate

MR. JUSTICE COTHRAN: This is an action upon a policy of insurance issued June 28, 1921, upon the life of J. Walter Sanders, for $5,000, the beneficiary being the plaintiff C. C. Sanders, his brother, to whom he appears to have been indebted for advances in a live stock sales stable at Union, S. C. He had been engaged with a life insurance company, and during the summer of 1922 had closed his sales business and resumed work for the insurance company in

Atlanta.    After he had been in Atlanta for a few weeks, he was found dead in his bed, in a room at his boarding house, with a bullet wound near the center of his forehead, a pistol with one shot fired lying upon his breast, and a bottle containing a small quantity of whisky by his side.

The policy sued upon contained this clause:

"In case of self-destruction within one year from the date of issue, whether the insured be sane or insane, the liability of the company shall be limited to the amount of the premium paid thereon."

The company denied liability under the policy for anything more than the amount of the premium paid, upon the ground that the insured had committed suicide, and offered to allow judgment for said premium with interest, which offer it kept good by tendering and depositing with the Clerk of Court the amount thereof.    At the close of the evidence the defendant moved the Court for a directed verdict in favor of the plaintiff for $241.50, the amount of the premium paid, with interest, upon the ground that as it appeared from the evidence that the insured had committed suicide, that was the limit of its liability.    The motion was refused. The jury returned a verdict in favor of the plaintiff for $5,000 with interest, and from the judgment entered thereon the defendant has appealed.

While there are fourteen exceptions by the appellant, the argument of its counsel is practically limited to the main issue, the alleged error of the presiding Judge in not directing the verdict as requested by the defendant, upon the ground that only one reasonable inference can be drawn from the evidence, namely, that the insured had committed suicide.

The testimony tended to show the following facts:

The insured had left his home in Union, where he had a wife and children, and had gone to Atlanta in company with a woman whose character and reputation does not appear from the evidence to have been by any means above re-

proach.   His relations with her are shown to have been
intimate, if not unlawful.   They were constantly together,
and though boarding at different places, were frequently at
the boarding houses of each other.   He was behind in his
accounts with his company and earning only about $30 per
week; despondent, drinking, and threatening to kill himself.
The afternoon before his dead body was found, he was
drinking; became offended with the woman and jealous of
attentions paid to her by other men.   About 7:30 a. m.,
the woman called at his boarding house and inquired for
him.   The landlady stated that he had not come down.
The woman asked the landlady to go with her to his room.
She declined.   The woman went alone, found the door
partly open, went in and found the insured lying upon his
back, in the bed, the sheet drawn up to his breast, a bullet
hole in his head, a pistol once fired on his breast, and a bottle
with a small quantity of whisky in it under the cover.   The
wound was near the center of his forehead.   Powder burns
surrounded it.   On his left hand were powder burns and
between his fingers.   There were no indications of a strug-
gle anywhere in the room.   The pistol was identified as
one belonging to him.   It had, as stated, a single exploded
shell in the chamber.   The physician testified:

"He found a wound in the center of the forehead, ap-
parently a bullet wound, surrounded by powder burns, and
powder burns on the thumb and first two fingers of the left
hand.   * * *   These burns indicated that the muzzle of
the pistol was at a close distance from the forehead if not
in contact with the forehead.   * * *   A gun held more
than six inches from the forehead would not have made
such powder burns as in this case, as they would have been
more scattered and not as sharply defined.   * * *   As
to the powder burns on the left hand, the witness stated that
the three fingers spoken of, showing the powder burns, were
necessarily in close contact with the muzzle of the gun, and
also in close contact with the forehead, and gave the impres-

sion that the muzzle was being held by the fingers of the left hand, probably held in position" (which doubtless accounts for the fact that the report was not heard by any one).

The blood from the wound had saturated the bedclothes and had seeped through the mattress to the floor. When the body was discovered the blood on the floor was cold, showing that the deed had been committed some hours before, although the blood under the body was still warm. From the character of the wound which was fatal it must have been received while the insured was lying in the position in which his body was found; he could not have received it at some other point in the room and then assumed that position.

The wound must have been received in one of three ways: By accident, by design, or by an assault from a murderer. The undisputed evidence as to his position, the character of the wound, and other circumstances detailed show that there is not the slightest ground for a conjecture, even that it was the result of an accident; that is impossible. The evidence to sustain the possible theory that the wound was inflicted by an assassin is alike absolutely wanting. It has been sought to implicate the woman. There is not the ground even of a suspicion against her. Evidently, the shot was fired some hours before the body was discovered, possibly, 3 or 4 o'clock in the morning. It appears that the woman called for him about 7:30 a. m.; she saw the landlady and asked her if Sanders had come down and if he was "all right." Much is made of this question; but in view of the evidence that he was drinking the night before, it may be referred to that. It is inconceivable that she could have come in during the night, killed the insured, and escaped without the slightest alarm. Certainly she did not kill him after she arrived there at 7:30, for she asked the landlady to accompany her, and the landlady was alarmed by her screaming immediately after she had declined to go with

her; besides, the blood on the floor was cold when the body was discovered, and had passed through the mattress. It appears that after the personal effects of the deceased had been packed in a dress-suit case and carried to Union, upon being opened up, a discoloration appeared upon an undershirt. The garment had been freshly laundered and the spot was folded in so that it had not been previously discovered. In the first place, it was not shown to have been blood; but if it had been, I do not see what possible probative force it may have had in supporting a theory of assassination. If an assassination, there appeared no reason for or evidence of a handling of the body by the assassin, and if a handling took place, it is unreasonable that the wiping of the blood would have occurred in this most improbable manner.

So by the clearest evidence possible, and by the exclusion of the theories of accident and assassination, it appears to me beyond a reasonable doubt that it was a case of suicide. An inquest was held in Atlanta; the jury rendered a verdict of suicide; the woman was discharged; and the suicide's body was taken back to his home for burial, without the slightest effort on the part of his family to pursue the theory of assassination any further.

But, it is argued, the presumption that a man will not, and in this case that the insured did not, commit suicide, is in the nature of affirmative evidence, and, continuing through the entire case, required a submission of the issue of suicide to the jury.

In the years that have passed, when the offense was rare, when the crime was so abhorrent that punishment was even visited upon the inanimate body by burying it at a crossroads with a stake driven throught it, the fiction was invented. In the latter days, when it has become so terribly and distressingly frequent, when men have lost the ancient fortitude of "taking arms against a sea of trouble, and by opposing end them," when their "coward lips did from their

colors fly," it may well be doubted whether the presumption should longer be recognized.    But assume that it is still to be so recognized; the meaning is that it is only a presumption, rebuttable, and fades away when irreconcilable, uncontrovertible facts are presented in evidence.    It is a substitute for facts, and logically disappears when that for which it is substituted is made to appear.

In *Joyner v. South Carolina Ry. Co.,* 1 S. E., 52; 26 S. C., 49, the Court says:

"When the defendant offers no evidence, it [the presumption] becomes conclusive; when the defendant offers evidence which not only fails to explain, but in itself shows negligence, of course the plaintiff will prevail.    But if defendant's evidence overthrows the *prima facies* and makes out affirmatively a case of accident, the presumption is gone and the plaintiff must fail."

In *Mack v. South Bound R. Co.,* 29 S. E., 905; 52 S. C., 323; 40 L. R. A., 679; 68 Am. St. Rep., 913, the Court said:

"If the facts showed that there was no negligence, then, of course, the presumption would be ineffectual."

In *Brown v. Atlanta & C. Air Line Ry. Co.,* 19 S. C., 39, the Court said:

"The fact of the injury being proved, the onus was upon the company to disprove negligence [that is to say, I interpolate, the presumption arose], which they might do [that is, remove the presumption], by showing that they had the most improved mechanical contrivances to prevent the escape of fire, and that on that day such engines were managed with due care and skill."

In *Baker v. Western Union Tel. Co.,* 69 S. E., 151; 87 S. C., 174, the Court said:

"The general rule is not, however, always applicable, for the evidence offered by the defendant may explain so clearly the act on which the presumption of negligence rests, and show due care so plainly and indisputably that the pre-

sumption originally created would be completely destroyed. When no reasonable man could fail to come to the conclusion that the presumption had been so destroyed, and there is no other evidence of negligence, then it would not only be within the power of the Court, but its duty, to order a nonsuit or direct a verdict for the defendant."

In *Parnell v. Atlantic Coast Line R. Co.,* 74 S. E., 491; 91 S. C., 270, which involved the presumption that goods delivered to a consignee in bad order, and shown to have been received by the initial carrier in good order, were damaged while being transported by the final carrier, the Court said:

"Nevertheless, when the rebutting evidence is so clear and conclusive that no reasonable man could fail to come to the conclusion that the damage had not been done by the terminal carrier, then it would be the duty of the Court to order a nonsuit or direct a verdict for the defendant"—the presumption having been dissipated by the conclusive character of the evidence.

In *McLeod v. Atlantic Coast Line R. Co.,* 76 S. E., 19, 705; 93 S. C., 71, which involved the presumption of negligence when stock are killed on the track (*Danner's Case,* 4 Rich., 330), the Court said:

"It is true that circumstances or other direct evidence may so support the testimony of an employee that no other than a conclusion favorable to him on these points could be reasonably reached; and in such a case it would be the duty of the Court to announce the conclusion of law that the presumption of negligence from the killing of live stock had been completely rebutted, and that the plaintiff could not recover."

In the report of the case of *McKendree v. Ins. Co.,* 99 S. E., 806; 112 S. C., 335, the facts are not detailed, and it is impossible therefore to draw a comparison between them and those of the case at bar. There must of necessity

have been some evidence in the case which tended to show an accidental killing, for the Court says:

"The testimony in this case did not so far and so surely overcome that presumption [against suicide, I add], as to have warranted the Court to take issue from the jury"— implying very clearly that, if it had done so, the presumption would have faded from the case and a directed verdict would have been proper.

The rule everywhere is in harmony with the law of presumptions as above outlined in the cases from this Court.

"But it is well established that the fact of death by accident is not to be established by conjecture or presumption, unless there is no evidence whatever as to the cause of the death. The presumption of death by accident is *prima facie* only and is rebuttable, and, as said by several of the decisions, easily rebuttable by physical facts in evidence, and this presumption prevails only when the cause of the death is unknown.    *   *   *    When evidence is produced which is contrary to such a presumption, or the presumption is met by a conflicting presumption, it disappears, although the fact upon which it rests may still remain proper to be considered in arriving at a conclusion." *N. Y. Life Ins. Co. v. King,* 112 S. E., 383; 28 Ga. App., 607.

"Where the facts appear from which the issue of accident or suicide might be determined, then all presumptions, such as the love of living, and against suicide, are out of the case, and that a plaintiff will not be entitled to recover and bolster up the case on such presumption where the facts of the tragedy are introduced in evidence." *Thompson v. Business Men's Accident Ass'n* (Mo. App.), 231 S. W., 1049.

"The law does not prescribe any formula by which the hypothesis of accident must be removed; it is sufficient that it is met by evidence, where there are no facts or circumstances shown indicating accident or mistake and facts and circumstances are shown which establish that the cause

of the death was suicide." *N. Y. Life Ins. Co. v. King,* 112 S. E., 383; 28 Ga. App., 607.

"When a man is found dead under circumstances showing clearly that he killed himself, there can be no presumption that death was accidental * * * or that it was from natural causes, for that matter. *John v. Northwestern Mutual Relief Ass'n,* 63 N. W., 276; 90 Wis., 332; 41 L. R. A., 587, is an apt illustration of the postulate. There the assured was found dead in a cistern. The aperture through which entry took place was so small that it could not, by any reasonable hypothesis, be inferred that he fell in while casually walking or passing over the cistern. So it was held that the inference of self-destruction was so strong as to overcome any presumption of accident that might otherwise be indulged." *U. S. Fidelity & Guaranty Co. v. Blum* (C. C. A.), 270 F., 946."

In *Leman v. Manhattan Life Ins. Co.,* 15 So., 388; 24 L. R. A., 589; 49 Am. St. Rep., 348, it is held that if the circumstances exclude with reasonable certainty any hypothesis of death by accident or by the act of another, the presumption against suicide does not prevail.

In *Cosmopolitan Life Ins. Co. v. Koegel,* 52 S. E., 166; 104 Va., 619, it is held that the defense of suicide will prevail if the circumstances exclude every hypothesis of accidental death. To the same effect is *Southern Atlantic Life Ins. Co. v. Hurt,* 79 S. E., 401; 115 Va., 398.

In *Hodnett v. Ætna Life Ins. Co.,* 87 S. E., 813; 17 Ga. App., 538, it is held that where the conceded facts show conclusively a case of suicide, they will be held to have overcome the presumption against suicide, and justify a directed verdict in favor of the insurance company.

"Where a man is found dead under circumstances showing clearly that he killed himself, there is no presumption that his death was accidental, at least none which requires additional evidence to overcome. There is only a presumption that death was accidental where the man is found dead

under circumstances leaving the cause of death in doubt. (Citing cases.) And whatever presumption exists may, in any case, be overcome, not only by oral testimony, but by reasonable deductions, or inferences from the facts established. (Citing cases.) So irresistible were the reasonable inferences to be drawn from the established facts in this case that the Court might well have withdrawn the question of suicide from the jury and directed a verdict for the defendant. (Citing cases.) *Supreme Tent Knights of Maccabees v. King,* 142 F., 678; 73 C. C. A., 668.

In *Wood v. W. O. W.,* 147 N. W., 888; 166 Iowa, 391, it is held that although the presumption against suicide has the force of affirmative evidence, it will not be allowed to prevail if the surrounding facts and circumstances leave no other reasonable hypothesis than that of suicide.

In *Gavin v. Des Moines Life Ins. Co.,* 126 N. W., 906; 149 Iowa, 152, in a case quite parallel with the facts of the case at bar, the Court said:

"There is nothing in the record to sustain the theory of an accidental shooting, and the only way that it can be sustained is by force of the presumption against the taking of one's own life  *  *  *  [after discussing the entire absence of such evidence]. It would be a manifest injustice to permit the presumption upon which the plaintiff alone relies to prevail over so many undisputed facts and circumstances showing a deliberate act on the part of the deceased."

"But this presumption is rebuttable, prevailing only until overthrown by evidence; and the requisite evidence may consist of physical facts so clearly inconsistent with such presumption as to entirely overcome it." *Penn. Mut. Life Ins. Co. v. Spaulding,* 150 P., 494; 50 Okl., 307.

"So long as the evidence is consistent with the theory of accidental death, the rebuttable presumption still remains and controls, but when the barrier of presumption against suicidal death has been overcome, and all hypotheses consistent with accidental death have been eliminated and re-

moved, then the defendant is required to prove by a fair preponderance of evidence only that the death of insured was by suicide." *Modern Woodmen v. Kincheloe,* 91 N. E., 976; 175 Ind., 563; Ann. Cas., 1913-C, 1259.

It is true that in cases such as this, suicide is an affirmative defense, and generally it is a defense that should be submitted to the jury as an issue of fact; but it is not true that an affirmative defense cannot be so clearly and indisputably established that its existence should not be accepted by the Court as proved in law. Where all the evidence in a case is of such character that it affords no reasonable doubt about an ultimate fact, there can be no issue, and therefore nothing concerning such fact for the triers of fact to determine. The presumption against suicide is very strong— strong as the universal instinct for life but it may be overcome by proof, just as the instinct for life, in individual instances, may be overmastered by a desire for death; and we perceive no reason in law or logic for saying that the fact of suicide cannot be established in law. The true rule thus is tersely stated by the Supreme Court of Wisconsin in *Agen v. Ins. Co.,* 80 N. W., 1020; 105 Wis., 217; 76 Am. St. Rep., 905:

"Where the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense, with such certainty as to leave no room for reasonable controversy on the subject, a jury should not be permitted to find to the contrary and have such finding stand as a verity in the case, but the question should be decided by the trial Court as one of law."

"The presumption may be rebutted and must yield to facts clearly inconsistent therewith, and, if competent proof of facts and circumstances surrounding the death so clearly and unmistakably point to the conclusion of suicide as to exclude all reasonable probability of natural death or accident the presumption will be destroyed and the defense sus-

tained." *Walden v. Bankers' Life Ins. Co.,* 131 N. W., 962; 89 Neb., 546.

In *Ingraham v. National Union,* 72 N. W., 559; 103 Iowa, 395, it is held that where the evidence is such that only the inference of suicide can reasonably be drawn, there is no room for the presumption against suicide.

In a suit on a policy relieving the insurer of liability in case of the suicide of the insured, where the defense is suicide, and where the evidence is so clear as to exclude any other rational hypothesis than that of suicide as the cause of death, the ordinary presumption against the fact of suicide will not be allowed to destroy the rational conclusion deducible from such proof, and it is proper to direct a verdict for defendant. *Somerville v. Knights Templars & Masons Life Indemnity Association,* 11 App. D. C., 417.

It has been held in numerous cases, and I think correctly, that the presumption that a death was not the result of suicide prevails only under the following circumstances: (1) Where there is an absence of evidence as to the cause of the death; or (2) where there is such evidence and it is conflicting; or (3) where some of the evidence is consistent with a reasonable hypothesis of death from natural causes or from an accident or from the act of another.

Unless some one or more of these conditions appear, there is no place for the presumption.

"The presumption against suicide or self-destruction is a rebuttable one and cannot properly prevail, except in the absence of evidence as to the cause of death, or where there is such evidence, and it is conflicting, or some of it is consistent with a reasonable hypothesis of death by accident or by the act of another." *N. Y. Life Ins. Co. v. Bradshaw* (C. C. A.), 2 F. (2d), 457.

"Being, as it is, entirely opposed to natural instinct to deliberately take one's own life, the fact will never be inferred unless the evidence is such as to fairly exclude every other reasonable hypothesis as to the cause of death. Of

course, the presumption will not prevail against clear and definite proof; but if the circumstances are consistent with any other reasonable theory, the latter must be adopted to the exclusion of that of suicide." *Neasham v. New York Ins. Co.* (D. C.), 244 F., 556.

"As long as the evidence is consistent with the theory of accidental death, the presumption against suicide is controlling.   *   *   *   If the known facts are consistent with a cause of death which does not involve self-destruction, that cause must be accepted.   After all the hypotheses which are consistent with an innocent or accidental death are eliminated, the conclusion of suicide may then be drawn.   The burden is upon the defendant to show that the circumstances and conditions are inconsistent with any other reasonable cause of death than that of suicide; that is, it must eliminate and disprove all other causes of death which are consistent with the evidence before the jury is justified in inferring that the deceased committed suicide." *Lindahl v. Independent Order of Foresters,* 110 N. W., 358; 100 Minn., 87; 8 L. R. A. (N. S.), 916; 117 Am. St. Rep., 666.

"Where the evidence as to the death being accidental or suicidal is so nearly balanced as to leave the question in doubt, the presumption is in favor of the theory of accidental death." *Mutual Life Ins. Co. v. Wiswell,* 44 P., 996; 56 Kan., 765; 35 L. R. A., 258.

"That presumption becomes operative only after the introduction of evidence compatible either with the theory of accidental death or with the theory of suicide.   In such cases, the law presumes accidental death rather than suicide. The Court therefore properly sustained the motion of defendant for judgment upon the pleadings." *Farnsley v. Philadelphia Life Ins. Co.,* 161 S. W., 1111; 156 Ky., 699.

"Where the fact of death is established, and the evidence points equally or indifferently to accident or suicide as the cause of it, the theory of accident rather than of suicide is

to be adopted." *Travelers' Ins. Co. v. Sheppard,* 12 S. E., 18; 85 Ga., 751.

"In case of a death under such circumstances that it may or may not have been caused by suicide, the legal presumption is in favor of the latter, which should prevail in the absence of evidence sufficient to establish the former to a reasonable certainty." *Agen v. Metropolitan Life Ins. Co.,* 80 N. W., 1020; 105 Wis., 217; 76 Am. St. Rep., 905.

What is the presumption, anyhow, upon which the plaintiff relies? The death must of necessity have occurred in one or the other of four ways: (1) Natural causes; (2) accident; (3) assassination; (4) suicide. The plaintiff does not specify upon which of these theories his presumption attaches; he blankets the proposition with the contention simply that it was not suicide. I do not think that he was called upon to particularize, if there was any evidence in the case tending to support any of these theories other than suicide.

He certainly cannot contend that the death was due to natural causes; so that theory may be eliminated. He cannot contend that there was a presumption that he was murdered; that presumption can no more be claimed than the defendant can claim that he committed suicide. And there is not the slightest evidence in the case that tends to support this theory. That theory may therefore be eliminated. There remains only the choice between accident and suicide. As I have endeavored to show, there is not a circumstance in the case that lends color to the theory of an accidental killing. It is inconceivable that one with a fatal shot in his brain, paralyzing every muscle, could have walked to the bed, stretched himself at full length on his back, and drawn the sheet up to his breast. The shot must therefore have been fired while he was in that position; he could not have moved afterwards. The location of the wound and the direction of the bullet into his brain refute the possibility of an accident; the power burns on his forehead and fingers sustain

the interpretation given by the physician, that he held the muzzle of the pistol with his left hand, close to or against his forehead, and pulled the trigger with his right.

The judgment of this Court should be that the judgment of the Circuit Court be reversed and that the case be remanded to the Circuit Court for judgment in favor of the defendant under Rule 27.