13771

APPLEBY v. RESERVE LOAN LIFE INS. CO.

(172 S. E., 776)

Before RICE, J., Allendale, April, 1932.

*Mr. George Warren,* for appellant,

*Messrs. Frank G. West* and *Searson & Searson,* for respondent,

February 13, 1934.

The opinion of the Court was delivered by Mr. Chief Justice Blease.

The respondent life insurance company, on August 14, 1928, in consideration of the payment of the first annual premium thereon by the insured, issued its policy of life insurance, in the sum of $2,000.00 on the life of Arthur Bellinger Appleby, and the appellant, his wife, was the beneficiary named therein. Under the terms of the policy, the insured was entitled to a grace period of thirty-one days, or until September 14, 1929, without interest, to make payment of the annual premium due on August 14, 1929. The insured died November 4, 1929.

The respondent, denying liability on the policy, declined payment. Thereupon the beneficiary instituted this suit in the Court of Common Pleas for Allendale County. She alleged that the company, on September 13, 1929, accepted from the insured the sum of $13.96, and an extension to November 14, 1929, for payment of $120.00, which action on the part of the company continued the policy in full force up to, and at the time of, the death of the insured. That claim was controverted by the respondent.

In the trial, his Honor, Judge Rice, who presided, refused both a motion for nonsuit and one for a directed verdict made by the respondent, for the reason that there was, in his opinion, *some evidence* to go to the jury on the main issue in the cause, whether there had been an acceptance by the insurance company of the sum of $13.96 on the pre-

mium due on August 14, 1929, payable within the grace period thereafter, and an extension of the time for the payment of the balance of the premium, then due, to November 14, 1929. Under the holdings of the Circuit Judge the jury were instructed, if they found that the payment had been made and the extension agreed upon, as contended for by the plaintiff, they were to return a verdict in her favor; and, otherwise, their verdict would be for the defendant, insurance company. The verdict was in favor of the plaintiff for the sum of $2,000.00, and interest from November 14, 1929, less $120.00, the balance found by them to be due on the premium account.

A motion for a new trial by the defendant was made, and, after considering the same for some time, Judge Rice, reaching the conclusion that he should have directed a verdict in favor of the defendant, ordered a new trial. From that order, the plaintiff has appealed to this Court.

In the agreed statement, the parties, through their counsel, say:

"The sole question before the Supreme Court on this appeal is, was there any evidence of acceptance by the company of $13.96 on the premium due August 14, 1929, and payable any time within thirty-one days grace period, and an extension note of $120.00 to November 14, 1929?"

The important evidence in the case appears in letters introduced as exhibits.

Some time prior to the due date of the second premium, the company, from its home office in Indianapolis, Ind., sent the insured the usual notice that the premium on his policy would be due on August 14, 1929. A little later, it sent him a notice to the effect that the premium had not been received, and, if it was not convenient for him to make payment before the expiration of the grace period, if he would write as to when he would be in position to pay, the company would be glad to help him.

On September 3, 1929, the auditor of the company wrote the insured, advising him that the grace period would end

on September 14th, and urged him, if he had not already remitted, to send the premium at once. In the letter, the insured was informed if it was not convenient for him to pay the annual premium, he would be allowed the privilege of paying either a semi-annual or quarterly premium, and he was invited "to use this privilege," if necessary. He was also told that if he could not "now spare the money for even a quarterly installment" to let the company know immediately, so it might "have an opportunity to offer a helpful suggestion," for the reason that the company was "anxious that your beneficiary should not be deprived of a moment of your life insurance protection."

On September 10th, the insured wrote the company to the effect that conditions were such that he could not then make payment of the premium and asked, "What can you offer and keep it in force?" On September 13th, the "Policy Loan Department," evidently replying to the letter of the insured, wrote him that the company would "be glad to extend the time for payment of your premium, as you requested." That letter advised the insured that, to secure the extension, he would be required to sign "the enclosed agreement and return it promptly, with cash of $13.96 for credit." It was stated that of the sum of $13.96, $12.16 would be part payment of the premium, and $1.80 would be interest "on the extended balance." At the heading of this letter, after referring to the number of the policy of the insured, the amount of the premium, its due date, and the expiration of the grace period, these words appeared, "Extension: $120-.00; Nov. 14th, 1929."

On September 21st, J. F. Ouzts, Jr., "southern manager" of the company, with offices in Greenwood, this State, wrote the insured that he had received notice from the home office that the insured had allowed his policy to lapse; that he felt that the matter was an oversight on the part of the insured, who would "still desire to carry your good policy," which had been bought at a cheaper premium than it could

be purchased at the time of this letter. Mr. Ouzts offered to be of assistance in reinstating the policy, and he told the insured if "it does not suit you to pay all of the premium at this time, you can pay a small portion and will carry the balance for you for a number of months."

September 25th, the policy loan department wrote the insured, inquiring if he had overlooked the letter of September 13th, in which the company had offered to give him "until November 14, 1929, to pay the larger portion of your annual premium of $120.00, that became due August 14." In this letter, the insured was informed that, although the policy had lapsed, the company would gladly reinstate the insurance upon satisfactory evidence of present insurability, the execution of the extension agreement, and remittance to it of cash of $13.96.

A few days after the death of the insured, the exact date not appearing in the record, E. V. Green, a local soliciting agent of the insurance company, working under Mr. Ouzts, the southern manager, wrote the latter as to the standing of the policy of the insured, but that letter does not appear in the record. To the inquiry of Green, the southern manager replied on December 10th, referring to Mr. Green's letter as being of the date of October 14th, which Mr. Green testified was probably not the correct date of his letter, for he was sure he had not written Mr. Ouzts, until after the death of the insured, which occurred on November 4th.

Since the question before us turns almost entirely, if not completely so, upon this letter of Mr. Ouzts, dated December 10, 1929, we refer to it at length, quoting *verbatim* extensively therefrom. First, Mr. Ouzts referred to the number of the policy of the insured, and asked pardon for delay in answering the letter of Mr. Green, giving as his reason therefor his absence from his office for practically a month, the result of an automobile accident. Then said Mr. Ouzts in his letter:

"This policy carries a quarterly premium of $35.02; Semi-annual premium of $68.72. It seems that it lapsed August 14th with grace September 14th.

*"The Company on September 13th accepted from the insured the amount of $13.96 and extension of $120.00 to November 14th, which meant that Mr. Appleby was to pay $13.96 for the period of three months.* You can see that we cannot at this time revive his policy, but of course it would be in our favor for him to pay say $30.00 and we could give him an extension of the balance of the annual premium to January 14, 1930." (Italics ours.)

Furthermore, Mr. Green was advised by Mr. Ouzts as to the requirements, under the circumstances, for the policy to be reinstated at that time, information being furnished as to a medical examination and execution of the application for the reinstatement.

On December 14th, the beneficiary, by letter, notified the southern manager, Mr. Ouzts, of the death of the insured on November 4th, that she was informed that his policy was in force "at the time of his death by the payment of $13.96 and an extension to November 14, 1929, of $120-.00," and requested that blank proofs of death be forwarded for execution as should be directed.

On December 17th, Mr. Ouzts wrote Deming & Sox, with copies to the Reverend G. R. White and E. V. Green, quoting in full the letter of the beneficiary of December 14th, as to the death of her husband, and her request for blank proofs of death. He added in this letter that the insured had only paid one premium, "but as you will notice from the carbon copy of letter hereto attached, the Company was fair and willing to offer every assistance possible to carry the larger portion of the premium." And, said Mr. Ouzts, "I am merely citing this matter to you for we think it will be helpful." Evidently, the purpose of Mr. Ouzts, in writing this letter to the addresses, with copies to the other gentlemen named, was to advertise the fairness and generosity of

his company, since for no other purpose are we able to understand why Mr. Ouzts would have written Messrs. Deming & Sox, with copy to the Reverend Mr. White as to the matter, for these gentlemen appear to have never had any connection with the insurance on the life of Mr. Appleby.

Again, on December 17th, Mr. Ouzts wrote the secretary of the company, quoting the statements contained in the letter of the beneficiary to him, as to the death of her husband, and the request for blank proofs of death. He concluded this letter with the request that the company send direct to the beneficiary "the necessary papers, etc., to be completed."

On December 17th, Mr. Ouzts also wrote the beneficiary, indicating to her that his records showed that her husband's policy had lapsed on September 14, 1929, and that he failed to comply with the extension terms the company had offered him. He informed her that he was writing the home office, and that she would hear promptly from the secretary as to the correctness of his records. And on the same day, December 17th, Mr. Ouzts wrote the local agent, Mr. Green, to the effect that a review of his carbon copy of the former letter to Mr. Green of December 10th showed inaccuracies in the third paragraph, which has been heretofore quoted in full. He said the paragraph should have read, "The Company on September 13th agreed to accept from the insured the amount of $13.96 an extension of $120.00 to November 14th which amount Mr. Appleby was to pay $13.96 for the period of three months." He concluded with a statement to the effect that a carbon copy of a letter sent to Mr. Green on September 25th would show that the "policy was really not in force as we see it from here," but that he was taking up the matter of the standing of the policy with the home office. (Mr. Green testified that he had no recollection of seeing this September 25th letter.)

In the meantime, on November 23, 1929, not having heard from the southern manager, Mr. Green informed the

home office of the death of the insured, and asked for information as to the status of his policy. On November 26th, the insurer replied that the policy had lapsed for nonpayment of the second annual premium due August 14, 1929, and that the policy had no value after the expiration of the grace period.

The testimony of Mr. Ouzts, explanatory of the letters written by him, was to the effect that the one writen to Mr. Green on December 10th, through the error of an inexperienced stenographer, made him say that the company *had accepted* the payment of $13.96, when he had used, and had so dictated to the stenographer, language indicating only that the company *had agreed to accept* the small payment on the premium; that he discovered his error some two or three days prior to the receipt of the notice from Mrs. Appleby of the death of her husband; that he did not know on December 10th of the death of the insured, his first knowledge of that event being when he received Mrs. Appleby's letter; and that his letter to the company asking that proofs of death be sent to the beneficiary was occasioned by the information received in the letter from Mrs. Appleby, and with the desire to ascertain the real facts as to the status of the policy, since Appleby might have paid the amount asked for by the company to the home office, which was the proper place to which the remittance should have been sent. Mr. Ouzts testified that he had no authority to accept the second payments of premiums, that his authority was limited only to the first payments, and the appointment and supervision of subordinate agents, working under him in his territory, but he was entitled to commissions on renewals. He positively declared that he had no authority to bind the company as to matters pertaining to the payment of premiums, other than initial premiums. The contract between the company and Mr. Ouzts, introduced, seemed to corroborate the testimony of the witness.

Mrs. Appleby testified that she had not been able to find all of her husband's records pertaining to the life insurance

policy. Neither had she located a little book in which he kept a statement of certain expenses and entries of business transactions.

Mr. Green testified, from his knowledge of the manner in which Mr. Ouzts conducted business for the respondent, that "he is known as the southern manager with this company, but he acts in the capacity as the general agents in other insurance companies that I represent, and I would invariably send him the settlements."

A preliminary question relates to the authority of Mr. Ouzts, the southern manager, to bind the company by what he wrote in the letter of December 10th. The respondent objected strenuously in the trial to the introduction of that letter, on the ground that Ouzts had no authority from the company to write it, and, if he did write it, the company was not bound by what he said. The appellant contended that there was enough evidence to establish the general agency of Ouzts to act for the company, and even if he did not have such authority, the conduct of the company, in permitting him to hold himself out as an agent with full authority, was such as to estop the insurance company from questioning what he had done.

We think the December 10th letter was clearly admissible. Conceding that the written contract between the company and Ouzts did not give the latter the authority, which he apparently held himself out as possessing, yet, the title "southern manager," in itself, was right significant, and the company, in its written contract, declared that Ouzts should have that title. There was no proof to show that the insured, or his beneficiary, was informed of the contract limitations between Ouzts and the company. The stationery Ouzts used, evidently with the consent of the company, carrying his title as "southern manager," naturally, caused those with whom he dealt to believe that he was much more than an ordinary soliciting agent. His authority over agents in the solicitation of business seems to have covered much territory, even more

than the whole State of South Carolina. The contract showed that he had a remunerative interest, in the way of commissions, as to renewals on policies accepted by the company through him and his subordinate agents. He was constantly kept advised by the home office of the condition of the policies issued through his office. Green's positive testimony, taken with all the other facts and circumstances, to which we have adverted, made the agency of Ouzts, with authority to write the letter and to speak for the company therein, at least a question for the jury. Especially is this so, when there is taken into consideration the provisions of Section 7971 of the Code, concerning "who to be considered agents of foreign insurance companies," and the respondent in this case is a "foreign insurance company."

Under many decisions of this Court, too numerous ██ to be here cited, if there was *any evidence*, however slight, to show that the company had been paid, or, as it is termed by counsel, *had accepted*, the sum of $13.96 on the premium, and an extension of the time of payment for the balance of the premium to November 14, 1929, then, clearly, it was the duty of the Circuit Judge to submit the case to the jury.

Since the decision of the Court of last resort in this State announced in *Brown v. Frost*, 2 Bay (2 S. C. L.), 126, 1 Am. Dec., 633, decided in 1798, until the present day, the holdings of the highest Appellate Court have been to the effect that "wherever there was testimony, although of a doubtful nature, or a train of facts which were contradictory in themselves, or which admitted of different interpretations; in all such cases, the Court ought to send it to the jury, ultimately to determine between the parties." *Sanders v. Commonwealth Life Insurance Co.*, 134 S. C., 435, 132 S. E., 828.

A review of the evidence, which we have tried to give fairly, shows that there was *some evidence* favorable to the appellant's cause of action on the main issue, which the

parties concede to be involved in the case, and the determination of which is to decide the appeal. The letter of Mr. Ouzts of December 10th to Mr. Green, and his letter of December 17th to the company, asking that proofs of loss be sent to the beneficiary, contained *some evidence* that the sum of $13.96 had been accepted by the company in due time, and that an extension to November 14, 1929, for the payment of the balance of the premium, had been granted. In reaching this conclusion, we recall the rule, recognized and enforced in this Court in numerous decisions, that the law looks with disfavor upon the forfeiture of insurance contracts.

We are not called upon here to decide, indeed, we have no power to decide, who presented the preponderance of the evidence. This Court, under the provisions of the Constitution (Article 5, § 4), in actions at law, of which this is one, is "a Court for the correction of errors at law under such regulations as the General Assembly may by law prescribe." Neither the framers of the Constitution nor the legislators have given this Court the power to declare, in a case of this character, which side in a lawsuit has presented the preponderance of the evidence to sustain the claim made. That is to be determined by the jury, subject to the approval of the presiding Judge. Had his Honor, the Circuit Judge, granted a new trial, on the ground that the preponderance of the evidence favored the respondent, this Court would not, and could not, interfere with his decision. But the learned Judge concluded, as a matter of law, that he should have directed a verdict in favor of the respondent, on the ground that there was no evidence to support the cause of action of the appellant. In that, we must hold that he committed an error of law, and it is our duty, under the Constitution, to reverse his decision.

The judgment of this Court is that the order granting the new trial be, and the same is hereby, reversed.

MESSRS. JUSTICES STABLER, CARTER and BONHAM and MR. ACTING ASSOCIATE JUSTICE W. C. COTHRAN concur.