12892, 12899. NEW YORK LIFE INSURANCE COMPANY *v.* KING, administrator; and *vice versa.*

" There being no conflict in the evidence as to the physical facts connected with the death of the insured, and these facts, with all reasonable deductions and inferences therefrom, overcoming the pre-

sumption of law that he did not kill himself, or that his death was accidental, and demanding a finding that he came to his death by his own hand and intentionally, and the life-insurance contract sued upon containing the special provision that it should be void in the event of the death of the insured by his own intentional act, sane or insane, within two years from the date of its issue, and it affirmatively appearing that the contract was issued within two years of his death, a verdict was demanded for the defendant."

DECIDED MAY 24, 1922.

Action on insurance policy; from city court of Fort Gaines — Judge Turnipseed. September 6, 1921.

*Bryan & Middlebrooks, Zach. Arnold,* for plaintiff in error.

*Glessner & Collins, E. R. King,* contra.

HILL, J. This was an action by the administrator of the estate of Robert A. Coleman, deceased, against the New York Life Insurance Company upon a policy of life-insurance for $2,000, issued by the company on the life of the decedent. The petition alleged that the policy was issued on November 27, 1917, and that Coleman died on November 11, 1919, less than two years after the issuance of the policy. It was further alleged, that proofs of death had been furnished and that the defendant had failed and refused to pay over to the plaintiff the proceeds of the policy. It was also alleged that the defendant had acted in bad faith in refusing to pay over the proceeds of the policy and was liable to the plaintiff for damages and attorney's fees. A copy of the policy was attached to the petition. It contained the following stipulation and condition: " Self-destruction. In event of self-destruction during the first two insurance years, whether the insured be sane or insane, the insurance under this policy shall be a sum equal to the premiums thereon which have been paid to and received by the company and no more." The defendant in its answer admitted the execution and delivery of the policy and the furnishing of proofs of death and the payment of the premiums, and set up as a defense the allegations that on November 11, 1919, within the first two insurance years of the policy, said Robert A. Coleman destroyed himself by shooting himself in the head with a pistol, and that the insurance under the policy is, as provided therein, the sum equal to the premiums paid thereon and received by the company, and no more. The defendant further alleged that it had tendered to the plaintiff the amount of the premiums received by it on the policy, and that the plaintiff had declined and refused

to accept the same. The defendant, by an amendment to its original answer, admitted a prima facie right of the plaintiff to recover except as to damages and attorney's fees, and reiterated its defense of suicide within the first two policy years. The trial resulted in a verdict and judgment for the plaintiff in the sum of $2,000 principal, $96 interest, and $150 attorney's fees. No damages were awarded. The defendant's motion for a new trial, as amended, was overruled and the movant excepted. The plaintiff filed a cross-bill of exceptions to the judgment overruling his motion to dismiss the defendant's special plea, on the ground that the plea disclosed no reason why the defendant should be relieved from the payment of the full amount of the policy, that no legal and valid defense is therein set forth, that the quoted clause in the policy did not warrant the construction placed thereon by the defendant in its pleadings, and that the statement therein that the company's liability was limited to the premiums paid and received was a mere conclusion of the pleader.

The view that this court entertains of the case on its merits makes it unnecessary to consider and decide the questions raised by certain special assignments of error, the decision on the merits being conclusive of the relative rights of the parties. Before considering the evidence on the merits of the case and illustrative of the defense set up, there are several well-settled principles of law applicable to the facts and in the light of which the case will be determined. These principles are herein set out without discussion, and will be applied to the evidence in the record, by which it will be determined that a verdict, under the terms and conditions of the policy expressly set out, was demanded, and that the verdict for the plaintiff is not supported by any evidence either direct or circumstantial. In other words, the evidence shows that the insured, Robert A. Coleman, committed suicide within two years of the date of the policy; and, under the terms of the policy which are controlling on the question, the maximum amount legally recoverable is the amount of the premiums paid within the two years when the policy was in force, and no more can be legally recovered under the evidence and the law applicable thereto.

It is undisputed that the insured, Robert A. Coleman, died on November 11, 1919, during the first two insurance years of the policy, and that his death was caused from a pistol wound in his

right temple. The manner in which the wound was inflicted is not stated in the petition, but the general allegation is made that the said Robert A. Coleman died intestate in Clay County on November 11, 1919. The plaintiff offered no witness nor any evidence of any kind to show the cause of the death of Robert A. Coleman, or how the wound on him was inflicted, and it follows that the verdict rests solely upon the legal presumption against suicide, and in the present case the only support for this presumption is mere conjecture which is unsupported by any evidence of any character. In the decision of the Supreme Court in the case of *Jenkins* v. *National Union,* 118 *Ga.* 587 (45 S. E. 499), it was said: "We think it indubitable that when a contract of insurance provides that the policy shall be void in the event the insured shall commit suicide within a certain time, 'whether at the time of committing suicide [the insured] shall be either sane or insane,' the meaning is that, regardless of his sanity or insanity, the voluntary self-destruction of the insured within the time set out shall void the policy." In *Travelers Insurance Co.* v. *Sheppard,* 85 *Ga.* 751 (12 S. E. 18), the presumption against suicide was stated thus: "Where the fact of death is established, and the evidence points equally or indifferently to accident or suicide as the cause of it, the theory of accident rather than of suicide is to be adopted." And it is universally held that the defense that the insured committed suicide must be established by a preponderance of the evidence, but that the presumption against suicide easily yields to physical facts clearly inconsistent with it. *Hodnett* v. *Ætna Life Ins. Co.,* 17 *Ga. App.* 538 (87 S. E. 813). The case last cited is very much like the one at bar in its facts and the inferences therefrom.

Of course, if there is no evidence as to the cause of death, it will be presumed that the death is from natural causes. But the principle may be carried still further, and it may be regarded as a settled rule that, when the circumstances of the death are such that it might have resulted from negligence, accident, or suicide, the presumption is against death by suicide. This rule is stated by Mr. Cooley in his Brief on the Law of Insurance, Vol. IV, p. 3255. But it is well established that the fact of death by accident is not to be established by conjecture or presumption, unless there is no evidence whatever as to the cause of the death. The pre-

sumption of death by accident is prima facie only and is rebuttable, and, as said by several of the decisions, easily rebuttable by physical facts in evidence, and this presumption prevails only when the cause of the death is unknown. It does not prevail where there are facts bearing upon the question whether the death was intentional or accidental. When evidence is produced which is contrary to such a presumption, or the presumption is met by a conflicting presumption, it disappears, although the fact upon which it rests may still remain proper to be considered in arriving at a conclusion. As was well expressed by the Court of Appeals of Missouri: "Where the facts appear from which the issue of accident or suicide might be determined, then all presumptions, such as the love of living, and against suicide, are out of the case, and a plaintiff will not be entitled to recover and bolster up the case on such presumption where the facts of the tragedy are introduced in evidence." Thompson *v.* Business Men's Accident Ass'n of America, 231 S. W. 1049.

It has been repeatedly held by various courts, in discussing this question, that the issue as to the cause of death must be proved like any other fact in a civil action, by a preponderance of the evidence on the question. Modern Woodman of America *v.* Craiger, 175 Ind. 30 (92 N. E. 113, 93 N. E. 209). As stated in several cases on the point, the law does not prescribe any formula by which the hypothesis of accident must be removed; it is sufficient that it is met by evidence, where there are no facts or circumstances shown indicating accident or mistake, and facts and circumstances are shown which establish that the cause of death was suicide. "Men do frequently commit suicide. It is one of the multitude of legitimate inferences, in which we infer the unknown from the known, having greater or less degrees of probability, which we use in reasoning to arrive at the ultimate fact. Being a probability based upon human experience, in its nature, it is controlling only in the absence of evidence of the actual." Grosvenor *v.* Fidelity & Casualty Co., 102 Neb. 629 (168 N. W. 596). In other words, in its essential analysis the question we are discussing should be proved like any other fact. There should be nothing peculiar or exceptional in the method of proof. The tendency to find contrary to the facts in such cases is based upon the tendency of juries to find verdicts in insurance cases frequently against the weight or

preponderance of the evidence and according to their natural sympathies and inclinations. The American Law Review of December, 1918 (52 Am. Law Rev. 922), in discussing the case of Grosvenor *v.* Fidelity & Casualty Co., cited above, expresses the following opinion, which is borne out almost universally in the trial of such cases: "In practice, however, the juries by whom these cases were heard generally, if not always, ignored the evidence and found for the plaintiff as a matter of principle. The presumption against suicide was invoked when the appeal was heard, and the courts refused to disturb the verdict even though the ordinary man had no doubt as to cause of death."

In the present case, after giving the evidence most careful consideration, and applying to it the well-settled principles of law which have been stated, this court is clearly of the opinion that "the ordinary man would have no doubt as to cause of death," and that the deceased insured took his life by shooting himself through the head with a pistol. This fact is indicated by a very strong motive. It is demonstrated circumstantially by the physical facts in the case. There is nothing to the contrary of this conclusion except the merest conjecture, and this conjecture must yield to facts. It can only exist in the absence of such facts. Indeed, if there is any evidence in the case that shows the cause of death, that evidence must prevail. As against the mere conjecture, the slightest evidence of physical facts becomes strong, even conclusive. We do not hesitate to affirm, from a careful consideration of the record in the case, that the undisputed evidence proved that the cause of the death in this case was intentional suicide by the insured shooting himself through his right temple with a pistol. The evidence shows a strong motive for self-destruction. The insured was the unfortunate victim of a loathsome disease. This disease was urged upon him by his physician as a reason why he could not undertake the risk of marriage, and the existence of this disease not only prevented his marriage but caused him great mortification and humilation, so much so that he seems to have been unwilling to have a scientific test made as to the fact that the disease still existed and prevented him from consummating marriage. These two motives furnished reasons which apparently existed, and, in the absence of any other cause for suicide, strongly indicated the reason for the suicide. In addition to these

strong sentimental reasons the physical facts point unerringly to self-destruction.

In the evidence for the plaintiff it is not suggested how the pistol of the insured could have been placed opposite his right temple and be discharged so close as to burn the flesh and produce powder marks around the spot where the bullet entered, except by the intentional act of the insured. If he had dropped the pistol, causing it to discharge accidentally, it is impossible that he would have been shot through the right temple, the bullet going straight in; and it is altogether possible that there would have been no powder burns or burnt flesh. The evidence showed that the insured, just before he was shot, was sitting on the porch of the house, at the top of the steps, with his feet on the steps. There was no one near him just before the shot was fired. When last seen before the shot was fired, the pistol of the insured was lying by him on the floor of the porch. A son of the insured testified that immediately after he heard the pistol-shot he looked up and saw his father falling off the porch; that he heard the pistol shoot one time and he immediately called John Crapps; that he then went and looked at his father and saw the pistol under the door-step, about two or three feet from his father, who was lying down on the ground side of the door-step; that his father fell down the steps and rolled on one side; that after he was shot he rolled down the steps; that John Crapps picked up the pistol and opened it, and it was smoking; that as soon as he heard the shot fired he looked right at his father and saw him fall off of the step; that he did not see the pistol drop; that he saw his father fall immediately after the pistol fired; that his father was sitting down when he saw him fall; and that he did not know which hand his father had the pistol in. This son was so impressed with the correctness of this conclusion that the record contains a statement made by him, as a part of the res gestæ, that contemporaneously with the shot and while looking at his father he exclaimed that his father had shot himself. John Crapps testified, that he heard the pistol shot and that he ran and jumped over the fence and went towards where he heard the shot, and stooped down and looked under the house and saw the insured falling on the ground; that he did not see anybody about there, and that he ran up to the insured and that the insured had fallen on the ground with his face towards the

ground, and that the witness turned the insured over and saw the pistol on the right side of the body of the insured, something like three feet from him, and saw the wound and powder-burns on right side of his head; and that he unbreeched the pistol and found one cartridge had been shot.

We come to the conclusion that not only the preponderance of the evidence, but all of the evidence, both as to motive and physical facts, connected with the death of the insured, and that all reasonable inferences and deductions therefrom clearly overcome any presumption of law on the question of suicide or accidental death, and demands a finding that the insured came to his death by his own hand and intentionally; and, in view of the special condition in the contract of insurance that it should be void in the event of the death of the insured by his own hand within two years of the date of its issue, and it appearing affirmatively that the contract of insurance was issued within two years of the date of death of the insured, a verdict was demanded for the defendant, except that the defendant was liable for the amount of the premiums paid and received by the company; and a new trial should have been granted by the trial judge.

We do not think there is any merit in the cross-bill filed by the defendant in error.

*Judgment on the main bill of exceptions reversed. Bloodworth, J., concurs. Jenkins, P. J., dissents. Judgment on the cross-bill affirmed. Jenkins, P. J., and Bloodworth, J., concur. Stephens, J., disqualified.*

JENKINS, P. J. I dissent from the judgment on the main bill of exceptions. There was no witness to the actual homicide. The defendant, in seeking to carry the burden and overcome and disprove the legal presumption in favor of accident, had necessarily to rely upon proof as to the surrounding facts and circumstances. In the trial of the case in the court below it was incumbent upon the defendant, in thus seeking to carry the burden by circumstantial evidence, to submit testimony of such weight and probative value as could furnish " scope for legitimate reasoning by the jury," in order to sustain its defense, and the evidence thus submitted must also have preponderated in favor of its suicide theory rather than to any other reasonable hypothesis. Thus, while I agree with almost every proposition of law laid down by

my more learned colleagues, I cannot quite accept the reasoning contained in the majority opinion, wherein it is stated that, as against the legal presumption (which is referred to as a mere conjecture), "the slightest evidence of physical facts becomes strong, even conclusive." This presumption, solemnly established by the law, is not, as I understand it, a mere technical, arbitrary guess of the law, but is based upon the universal human instinct of self-preservation, and does not instantly give way to any sort of proved circumstances, however slightly they may suggest or however remotely they may tend to a contrary conclusion. The presumption resting where it does, and the burden of proof being therefore upon the defendant, the rules laid down by this court in *Georgia Ry. & Electric Co.* v. *Harris,* 1 *Ga. App.* 714 (57 S. E. 1076.), appear to be entirely applicable. It was there held that " Where a plaintiff in a civil case supports his action solely by circumstantial evidence, before he is entitled to have a verdict in his favor, the testimony must be such as to reasonably establish the theory relied upon, and to preponderate to that theory, rather than to any other reasonable hypothesis. While in such cases the sufficiency of the evidence is for the jury, yet before there is, in legal contemplation, any evidence for their consideration, the circumstances shown must in some appreciable degree tend to establish the conclusion claimed. A mere scintilla of inconclusive circumstances giving no scope for legitimate reasoning by the jury does not carry the burden of proof." In the decision Judge Powell speaking for the court said: " When the party upon whom the burden of an issue rests seeks to carry it, not by direct proof, but by inferences, he has not, in this reasonable sense, submitted any evidence for a jury's decision, until the circumstances he places in proof tend in some proximate degree to establish the conclusion he claims; and for this, the facts shown must not only reasonably support that conclusion, but also render less probable all inconsistent conclusions. The established fundamental rules applicable to circumstantial evidence are the same in civil as in criminal trials. In both cases it is required that the circumstances relied upon be not only consistent with the conclusion sought to be established, but also inconsistent with every other reasonable hypothesis. In civil cases, this consistency with the one and inconsistency with the other is required to be established only by a mere preponderance; in criminal cases, to the exclusion of reasonable doubt."

It is thus the opinion of the writer that, in a case where circumstantial evidence is relied on to overcome the presumption as legally laid down and established, the presumption is not only real, but becomes an important thing. In such a case, not only, as in all cases, might it be sufficient to throw the scale where the preponderance of evidence could not be determined, but in a case such as this it may control the verdict, even though he who carries the burden may have on his side whatever preponderance of evidence there may be, provided the circumstances are so slight and inconclusive that they cannot, in the opinion of the jury, be taken as sufficient to reasonably establish the conclusion sought to be sustained. Whether they are sufficient for that purpose is ordinarily a question for the jury. It is only when they manifestly fail to throw any appreciable light upon the controversy, or when the facts, with all reasonable deductions therefrom, absolutely demand and require one particular inference and no other, that this court can interfere.

This discussion may be beside the mark, however, so far as the merits of this particular case are concerned, since the writer does not in any wise argue or contend that the evidence offered by the defendant was inherently insufficient to have authorized the jury to find against the presumption and in its favor. The jury, however, have in fact found in favor of the plaintiff, and the trial judge having approved the verdict, the question before this court is not whether the defendant's evidence was sufficient to reasonably establish the theory relied upon by it, or whether it preponderated or even very strongly preponderated in its favor, but the question is whether the facts and circumstances proved, with all reasonable deductions and inferences therefrom, absolutely demand a finding against the presumption and in favor of the defendant's plea of suicide. It is needless to stress the fundamental and well-recognized proposition, which has so often been announced, that " This court, by the constitutional amendment creating it, is limited in jurisdiction to the correction of errors of law alone, and therefore has no power to grant a new trial on the ground that the verdict is strongly contrary to the weight of the evidence, if there is any evidence at all to support it." *Edge* v. *Thomas, 9 Ga. App.* 559 (71 S. E. 875). The Supreme Court speaking through Mr. Justice Adams, in the case of *Western & Atlantic R.*

*Co.* v. *Hunt,* 116 *Ga.* 448 (42 S. E. 785), used the following language: " We fully recognize that questions of fact are for the jury, and that their discretion as to the facts is a wide one. We believe, also, that they are better judges of the facts than are courts, and we have great respect for their verdicts. They are often affirmed in cases where it seems clear to the members of the appellate court that if they had been in the jury-box they would have rendered a different verdict. We recognize, also, that the discretion to set aside a verdict on the ground that it is strongly and decidedly against the weight of the evidence is reposed by law in the presiding judge, whose opportunities for determining this question are necessarily very much better than those of this court." I differ with my colleagues in this case because I cannot bring myself to the conclusion arrived at by them that the facts as shown absolutely demand the inference of suicide, and are altogether inconsistent with any other reasonable hypothesis.

Self-destruction, both accidental and intentional, is common enough. Strange, mysterious, and altogether unexplainable are the mental processes which ofttimes induce both the one and the other. The loaded weapon carelessly dropped or handled, and the " pistol that wasn't loaded," have claimed their thousands. While suicides, when taken in the aggregate, are not rare, they involve a breaking down of the strongest and most elemental human instinct, supported as it is by all the higher moral perceptions. Man's impulse is to " carry on," and his greatest strength seems sometimes to lie in his capacity to endure. Generally, if indeed it be not always true, the mind must first break down ere he will consent to give up. In the instant case there would seem to be no question as to actual fraud. The policy had been in force about twenty-three and a half months. It could hardly be supposed that it was taken out with intent to defraud. If such had been the purpose of the insured, he had only to wait two weeks longer, when under its own terms the policy would have become incontestable. Thus, there is lacking what might have been argued as the chief and strongest motive for suicide. It is in fact an argument against the theory of suicide that the insured did not wait the few remaining days when the policy by its terms would have been payable on account of death from such cause. The motive actually relied on by the defendant, while furnishing a proper ground of

argument before the jury, is not very strong or convincing. The evidence is that the deceased had been positively assured by his physician that so far as could be ·told by physical examination he was completely cured of the malady with which he had been afflicted. 'He was clinically sound. He was told, however, that since one could not be too sure in such a case, it would be advisable for him to take the blood test. This sound advice of a conscientious physician with reference to a disease which he believed had been eradicated does not suggest suicidal motives of any great strength. It was mere argument, which could properly be considered and weighed by the jury for the purpose for which it was offered.

Before entering upon a discussion of the testimony relative to the location of the wound, which in my opinion constitutes practically the entire strength of the defendant's case, let us consider the reasonableness of its theory of suicide as tested in the light of common knowledge and human experience. Did the deceased, if in contemplation of and preparation for suicide, conduct himself in that guilty, self-conscious, and secretive manner which human experience shows may have been reasonably expected ? We do not find him behind locked doors leaving to a world he could not face the almost inevitable confession. When last seen he was seated with his feet on the steps of his front porch. The pistol was in no wise concealed, but was lying openly beside him on the floor. To shoot himself while in this position, he would, as he did, necessarily have to fall headlong, face forward down the steps, and roll out into the yard where his little boy was playing. All of these circumstances seem unnatural, but it is especially hard to conceive that the harrowing act could have been intentionally committed in the very presence of his little son. As a suicide, it seems utterly unreasonable and contrary to all human experience.

But does the location of the wound in the temple, when taken with the testimony as to powder marks, prove the intent and dispose of the presumption, however contrary to nature it may seem ? The evidence as to powder marks is at best extremely vague and altogether indefinite. It rests solely upon the testimony of the little son and of another witness who arrived on the scene after the homicide, but it will be especially noted that neither of the two doctors who examined the wound was able to say that any powder marks or burns existed . If the pistol had in fact been placed very

near or directly against the temple when the shot was fired, is it possible to conceive that either òne of these physicians could by any possibility have failed to note powder marks and burns ? And now, as to the location of the wound, which as already stated constitutes the strongest and, as I see it, about the only evidence for the theory of the defendant. The doctors testified that the direction of the wound was not probed, but that it entered about the temple. The strength of this case is very different from thàt decided by this court in *Hodnett* v. *Ætna Life Insurance Co.,* 17 *Ga. App.* 538 (87 S. E. 813), from which the syllabus has been adopted. There the muzzle of the pistol had been placed inside the mouth at the time it was fired. There is a mountain of difference here. If the deceased, while sitting on the porch, had dropped the pistol on the floor or down the steps by his side, he almost inevitably would have involuntarily and instantly turned his head over toward the point at which it would fall. If this were done, the wound caused by the explosion would naturally be found on the temple. Nor is it unreasonable to think that some slight powder marks might have thus resulted, but not of a kind and character such as must have been noted by the physicians had the pistol been held close to the temple. In furtherance of the theory that the pistol was not held to the temple at the time of its discharge, the little son testified that he looked up at the sound of the shot, and although he saw his father fall forward down the steps, he did not then see the pistol drop or fall. While I do not contend that the circumstances are such as to clearly indicate that the homicide was accidental, neither do I think that they indicated with any sort of clearness the contrary supposition of suicide. My dissent is based, however, upon the rule of law that before the approved verdict can be overturned by this court, the proved facts and circumstances must not only be sufficient to authorize a finding contrary to the verdict rendered, not only must they clearly and strongly preponderate to such theory, but they must absolutely demand it, and must absolutely forbid, as a matter of law, any other reasonable inference. It is my opinion that the verdict of the jury as approved by the trial judge should not be set aside on the ground that the proved facts and circumstances, with all reasonable deductions therefrom, absolutely demand a finding in favor of the defendant's theory of suicide, and absolutely forbid as a matter of law the theory of accidental cause.