The court did not err in granting a nonsuit.
 DECIDED FEBRUARY 15, 1940. REHEARING DENIED MARCH 6, 1940.
This was an action by Mrs. Joyce V. Fox against the Mutual Benefit Health and Accident Association of Omaha, Nebraska, on an accident policy, to recover for the death of her husband. The policy provided that "suicide, sane or insane, is not covered," which defense was pleaded by the insurer. The evidence essential to a discussion of the case is substantially as follows: Mrs. Fox testified, that she lived with her husband in Miami, Florida, until the time of his death; that her husband was employed by the Florida Power Light Company as a "trouble shooter," and his salary was $152.50 per month; that on March 20, 1938, she was notified that her husband had been found dead near LaFayette, Georgia, with a bullet hole in his head; that she had the insurance company notified; that the premiums on the policy sued on had been paid since the policy had been issued; that at her request the company sent her blanks for filing proof of death; that she did not know anything concerning her husband's death, and did not learn anything when she went to LaFayette; that her husband had talked of going to the west coast of Florida fishing; that he often went fishing; that her husband had promised her son the use of his automobile the day he left Florida; that the last time she saw her husband alive on the day he left he was undecided whether to go fishing first or to go see his parents first; that when she returned home from her work on the day her husband left she found a note from her husband to her son, stating that he hated to disappoint the son about the car, but *Page 836 
that he was going fishing and would not return until sometime Saturday; that the car driven by her husband was a 1936 Dodge; that at the time of the purchase of the car, and while it was being paid for, it stalled easily and would choke down if the foot was removed from the accelerator; that at the time he left home he had his fishing tackle in the car; that her husband had no financial worries, but on the contrary had just ordinary household worries, and he was able to take care of the living expenses of his family; that he was not despondent and was in good health mentally and physically and was of sound mind; that he would take an occasional social drink, but was not addicted to the use of whisky or drugs, and never got drunk; that the revolver exhibited to her was the property of her husband; that he usually kept it in the seat by him until he got near where he was going, when he would remove it from the seat and put it in the glove compartment; that the glove compartment would be level with a man's head who was under the steering-wheel and who leaned over to the glove compartment.
Paul Fox testified, that he was the son of the deceased; that the last time he saw him alive was on the morning deceased left Miami; that his father took him to school that morning, and he was in sound health at that time; that there was never any serious trouble between his mother and father that he knew of; that his father never drank liquor to excess, but would drink wine occasionally; that his father told him that so far as he then knew, he (the son) could use the car Saturday night; that he would leave a note for the son about it; that he found the note left by his father; that after learning of his father's death he came to LaFayette with his mother; that he examined the car driven by his father and found the front seat very bloody; that there was fishing tackle in the back of the car; that the left rear tail light of the car had been smashed and pushed up against the car; that the car had been in an accident; that he had ridden with his father at night when he carried the pistol; that when there was some one on the seat with him, his father would place the pistol on the sun visor until he neared home, at which time he would place it in the glove compartment, and this was his usual practice; that his father was not despondent when last seen by the witness; that the blood and brains were on the front seat of car, all over the front seat in the center; that there was no blood underneath where a man under the wheel would have *Page 837 
been; that the only blood and brains he saw would have run right by a man sitting under the steering wheel.
A. J. O'Kelly, deputy sheriff, testified, that on March 20, 1938, he saw an automobile with a dead man in it at Grove's crossroad; that he was traveling south on the LaFayette Highway; that the old road was about 100 feet from the parallel to the new highway on which the car was parked; that the Central of Georgia tracks are between the two roads; that the automobile was in the middle of the road and about forty or fifty feet from the intersecting cross-road; that the dead man in the car was slumped over with his right hand between his legs and his left hand dropped down by his side, and he had a pistol in his right hand; that the hand was between his legs, his hand was resting on his leg, and the forefinger of his right hand was near the trigger in the manner of a man who had just pulled the trigger; that the glove compartment was open and the switch was turned on; that the rear of the car indicated that it had been in a collision; that there was a Chevrolet coupe in a ditch at an intersection some distance from the car of the deceased; that the left front headlight of this Chevrolet had been broken; that the glass from the tail light of the Fox car matched some glass in the road by the Chevrolet; that the distance between the two cars was hardly half a mile; that the feet of the deceased were so placed as to have one just by the accelerator and the other by the clutch, and the body was directly behind the steering-wheel. Tobe Beard, a deputy sheriff, testified in substance to the same details related by O'Kelly. J. H. Rhudy testified, that he was a tenant on the farm of Mr. Fox, the father of the deceased; that he saw the deceased in the automobile the morning of his death; that Mr. Fox and the witness went to the car together; that the father of the deceased did not know who the dead man was; that the feet of the deceased were crossed and the gun was resting on the seat, and the finger was loose at the trigger guard; that the glove compartment was open, and the car was in gear; that the man's head where the bullet entered had very little powder burns around the wound; that the gun was in the right hand of the deceased, his right hand was around the grip of the pistol, and one of his fingers was on the trigger with the end of the gun resting on the seat to the left of the left leg; that the powder burns were about the size of a nickel; that he did not feel the gear, but thought the car was *Page 838 
in gear because the witness was in the habit of leaving it in gear for a brake.
H. C. Shelby testified, that he was in the sheriff of Walker County; that he investigated the death of Casey Fox; that when he arrived at the scene the body had been removed from the car; that up to that point he had no opportunity to investigate; that he saw the Chevrolet automobile north of the Fox car; that he arrested Dave Cantrell and charged him with the murder of Casey Fox; and that he was not doing much investigating of the case now. Marshall McClure testified, that he was a nephew of the deceased, and so far as he knew he was the first to see him on the morning he was discovered; that the legs of the deceased were crossed at the ankles and were off the brakes, clutch, and accelerator, with the pistol in his right hand supported by the end resting on the seat, and his head and shoulders were leaning a little to the right of the steering-wheel; that the switch was turned on, and the car was in gear; that he saw the coroner put the car out of gear when the body was moved; that the deceased had the gun gripped in his right hand with his finger on the trigger and the muzzle of the pistol was resting between the legs of the deceased. D. W. Crawford testified, that he was a minister, and a brother of the plaintiff; that he examined the wound in the body of the deceased; that the wound was about the size of his little finger, and without powder burns; that this examination was made at the undertaker's establishment as they were washing the body; that there was very little blood; and that he did not know whether the wound had been washed or not.
Mrs. J. D. Fox testified, that she was the mother of the deceased; that on the morning of his death she was sleeping in a bedroom on the north side of her house, which had a window in the north side of the room; that the shade was up on that occasion; that about three o'clock in the morning of the death of her son her sleep was disturbed by a commotion near her home; that she saw the lights of an automobile shining across her bed and in her window; that the automobile was located north of her house, and was throwing a light in her window; that when daylight came her son's car was parked south of her house; that an automobile was stopped on the highway north of her house about three o'clock of the morning her son was found, and stayed there from that time until it was *Page 839 
moved, sometime later than the next day after the discovery of the body; that the automobile was a coupe and was in a ditch; that the commotion she heard was one car striking another, and the screeching of tires or brakes, and then it stopped; that there were necessarily two cars to cause the commotion; that she then heard more than one angry voice, and after the voices were heard she heard an automobile pull away from the scene of the crash; that when the car started up she heard either a backfire or a shot which she thought was a gun shot; that the light on the car in the ditch stayed on for some time, and shone in her window for at least an hour and a half; that the lights would shine across her bed from any car coming from the north at night; that when she looked out after the crash she could see only the one headlight of the car in the ditch; that she could not say whether or not the shot or backfire was near the scene of the crash, but that it was near the house and apparently came from the north of the house.
Other testimony tended to show that the car of the deceased and the car in the ditch had been in collision. Documentary evidence was introduced, which included the proofs of loss, a part of which was an affidavit by the coroner that the deceased died of a gunshot wound which had been self-inflicted. The affidavit of the undertaker attached to the proof gave the cause of death as suicide. The verdict of the coroner's jury attached to the proofs gave suicide as the cause of death. Also attached was a letter from Mrs. Fox to the company, stating that in her opinion her husband was murdered, but that she had no proof thereof. The letter from the company declining to pay the amount of the policy on account of the showing of the proofs that the death had been the result of a self-inflicted wound was also introduced.
The court granted a nonsuit, and the plaintiff excepted.
This case is governed by the rulings in New YorkLife Insurance Co. v. King, 28 Ga. App. 607 (112 S.E. 383),Gem City Life Insurance Co. v. Stripling, 176 Ga. 288
(168 S.E. 20), and Pilot Life Insurance Co. v. Wise, 48 Ga. App. 540
(173 S.E. 252). These rulings necessarily mean that in all cases the jury may not find the death to have been accidental by the consideration of the fact of love of life, and that in certain cases the court will *Page 840 
conclude as a matter of law that the death was due to suicide where all the evidence and inferences therefrom point to but one conclusion and exclude every reasonable hypothesis except suicide. Whether the burden of proof be on the plaintiff or on the defendant, when the plaintiff's evidence shows conclusively that the death was suicide a nonsuit is proper. In this case the deceased was found leaning over the steering-wheel of his automobile, with his hand around the handle of his pistol, with his finger at least partly on the trigger. The hole in his head was small, and all the witnesses who saw the wound before it was certain that it had not been bathed testified as to powder burns. For the deceased to have accidentally shot himself while putting the gun into the glove compartment, holding it as he had it, was very improbable, if not impossible. If he had had his thumb on the trigger, or had not had the handle in his hand, as one holds a pistol to shoot it, or if the pistol had been out of his hand entirely, we might hold differently. The theory of murder is just as improbable. The only evidence upon which such a conclusion could be based is that there was a slight automobile wreck, and that the deceased was killed with his own pistol at a different place from where the wreck occurred. The King and Stripling
cases, supra, as stated, are direct authority for the decision in the case at bar, which is stronger than those cases so far as the actual facts surrounding the death are concerned. In the King
case the pistol was not found in the deceased's hand under the circumstances shown here. If this fact had appeared, that decision would probably have been unanimous. The same is true of the Stripling case. While in this case we have no evidence of any reason why the deceased would have killed himself, and no evidence of an intention to kill himself, and no facts from which such an intention can be inferred, the conduct of the deceased was indeed strange, and the physical facts surrounding him after his death speak louder than any expressed intention of suicide, or the existence of reasons therefor, would have spoken. Many people with good reasons for so doing do not commit suicide, and many who express an intention to do so do not. Many commit suicide without expressing any intention of doing so, and others do so when there appears no good reason therefor. A number of cases are cited by the plaintiff in support of a contrary conclusion, but every case is so clearly distinguishable on its facts that we do *Page 841 
not deem it necessary to elaborate on the distinctions. They are all cases where the surrounding circumstances of the death did not demand a finding of suicide.
There is no merit in the contention that the insurer's defense of suicide was nullified by provisions of the policy providing against cancellation. The policy did not insure against suicidal death, and such a defense was not an effort to cancel the policy. The court did not err in granting a nonsuit.
Judgment affirmed. Sutton, J., concurs. Stephens, P. J.,dissents.