28422.  SUPREME FOREST WOODMEN CIRCLE *v.*
NEWSOME.

Decided October 17, 1940.  Rehearing denied November 15, 1940.

554

*Plunkett & Scarborough,* for plaintiff in error.

*Randall Evans Jr., Jack D. Evans, James R. Evans, Joel H. Terrell,* contra.

SUTTON, J. ■ After argument of this case before the court in May, 1940, the defendant in error filed, on August 12, 1940, a motion to dismiss the writ of error, on the ground that there is not attached to the bill of exceptions or to the brief of counsel for the plaintiff in error a certificate showing that the costs accrued against it in the trial court have been paid and nowhere in the record does it appear that such costs have been paid. Respondent calls attention to the fact that the motion comes too late, because the requirements of Rule 35 of this court (Code, § 24-3635) have not been met. This rule provides as follows: "No motion to dismiss a writ of error will be considered unless notice of such motion and of the grounds thereof, in writing, be given to counsel for plaintiff in error five days before the case is called for argument, service thereof to. be made and shown as required in the service of briefs. If because of the absence of counsel for the plaintiff in error such notice can not be given, the motion will be

entertained and such direction in reference thereto given as, in the discretion of the court, may seem proper. If the court has no jurisdiction, it will dismiss the writ whenever and however this may appear." It is obvious that the movant did not comply with the rule, but this court is requested to take note on its own motion that it is not shown that the costs in the trial court have been paid, and, even though the motion to dismiss be filed too late, to refuse to consider the case. This request does not merit dismissal of the writ of error. The appellate courts of this State are not without jurisdiction merely because the costs in the trial court have not been paid. In *Perkins* v. *Rowland,* 69 *Ga.* 661, 662, it was ruled: "The statute, it is true, requires the plaintiff in error to enter into bond and pay the costs, or else, in lieu thereof, file the affidavit. But this failure to do so does not deprive this court of jurisdiction to hear the cause. This failure to pay costs and give bond, or file an affidavit, simply denies the complaining party a supersedeas to the judgment below, and nothing more. The giving of bond and security upon carrying up of cases to the Supreme Court is optional, not compulsory. Where no bond is given, or affidavit filed, the opposite party is at liberty to proceed to enforce his rights in the court below by execution or otherwise, subject, of course, to the chances of a reversal. 1 *Kelly,* 1. Neither will the writ of error be dismissed because the record does not show that the costs in the court below have been paid. If the costs are not paid, the defendant in error may cause execution to issue, and proceed at once to make it in the court below. 6 *Ga.* 587." See *Cumberland Fertilizer Co.* v. *Williams,* 146 *Ga.* 27, 29 (90 S. E. 464); *Bennett* v. *Ralf,* 4 *Ga. App.* 484 (3) (61 S. E. 887); *Spooner* v. *Coachman,* 18 *Ga. App.* 705 (90 S. E. 373). Movant contends, however, that by the act of 1921 (Ga. L. 1921, p. 239), (Code, § 24-3622), enacted since the decisions above mentioned, the failure of a plaintiff in error to pay the costs which have accrued against him in the trial court will deprive this court of jurisdiction. This section declares: "Upon filing his original brief counsel for the plaintiff in error shall pay all costs due in the case, or shall file with his brief a statement that a pauper's affidavit has been duly filed to relieve him from the payment of the costs. The clerk is prohibited from receiving the brief of the plaintiff in error unless the costs have been paid, or a sufficient pauper's affidavit is con-

tained in the transcript. . . Briefs for both parties shall be filed with the clerk at least three week-days before the call of the trial calendar to which the case is assigned." It is contended by movant that the words "all costs," appearing in this section, must be taken to include the costs in the trial court. The argument, however, can not be sustained, because by reference to the act from which the section is codified it is plain that the legislature was dealing only with the costs in the appellate court. Section 1 of the act provides that from and after the passage of the act "the bill of costs in every case carried to the Supreme Court and to the Court of Appeals of this State and heard therein shall be fifteen dollars; and in every case carried to said courts, and withdrawn or dismissed on or before the same is called for argument, shall be ten dollars." Then follows the language embodied in the Code section as to payment "of all costs due in the case," etc. Section 2 provides that "out of the costs so collected" the clerk is authorized to pay named sums to his deputy clerk and to his stenographer as compensation for their services. Section 3 provides that it shall be the duty of the clerk to collect "the costs herein prescribed," and to make an annual report thereof to the State Treasurer and pay into the treasury the amount of costs shown by the report. The mere recital of these provisions negatives any idea that the General Assembly was legislating with reference to any costs in the trial court, and shows that the costs referred to are those to be paid to the clerk of the Supreme Court or the Court of Appeals. The motion to dismiss is without merit, and is overruled.

On the merits of the case we think, as contended by the plaintiff in error, that it could not reasonably be said that the insured died from any cause other than the intentional taking of strychnine poison. Under the terms of the insurance contract there could be no recovery "if the member holding the certificate . . should die . . by her own hand or act, whether sane or insane." It is undisputed that the deceased had been extremely nervous, worried, and depressed before her death. She had shortly theretofore sought to purchase strychnine from a local druggist. A few days later she was found, on a bed at the small telephone exchange which she operated, in convulsions and in a dying condition. Her physician was summoned, and immediately diagnosed her condition as resulting from strychnine poisoning. Several prominent citizens

searched her room, just across from the telephone exchange, and found a small bottle labeled "⅛ oz. strychnine sulphate" and "poison," about ⅛ of the contents missing. At the desk where the deceased worked were found three letters without a signature, one addressed to her brother, the plaintiff, one to her sister, Mrs. Land, and one to an undertaker in the town. The undertaker read aloud to those assembled the letter which was addressed to him, stating that the writer desired him to bury her body, directing what minister should conduct her funeral, naming pallbearers and when and where she should be buried, and what should be done with the balance of insurance money on her life. A few days later her brother, accompanied by their sister, Mrs. Land, took to Mr. Claxton, an insurance agent, the two letters which had been addressed to them, together with the certificate of insurance; and these letters were by Mr. Claxton read aloud in the presence of several persons. They mentioned what the writer of the letters wished done with her property, stating that the interest in the local telephone exchange should belong to the plaintiff, and certain personal property should go to Mrs. Land. The plaintiff asked the insurance agent, Mr. Claxton, whether or not under the certificate recovery could be had in case of the suicide of the insured. In the absence of copies of the insurer's constitution and by-laws showing, as they did, that the policy or certificate was not incontestible until after two years, Mr. Claxton informed him, in effect, that there seemed to be no reason why recovery could not be had. It appears that at this juncture the plaintiff considered that the deceased had taken her own life, and in his affidavit in connection with the proof of death the statement was made, "the cause of her death being suicide." The attending physician, Dr. McKinney, reported that the cause of her death was "strychnine self-administered," and on the trial he testified that her death was produced by strychnine poisoning; that he reached the telephone exchange a few minutes before her death, and found her in a dying condition; and that from the evidence of convulsions, dilated pupils of the eyes, and difficulty in breathing he diagnosed her condition as due to strychnine poisoning. The plaintiff offered as a witness Dr. A. W. Davis, who testified to symptoms usually accompanying strychnine poisoning, but stated that in the absence of an autopsy he could not say whether or not the deceased died

from such a cause, inasmuch as the condition of the body as described to him "is kin to some other condition, brain lesion and some forms of heart attack." He testified, however, that the main symptoms of strychnine poisoning were those testified to and observed in the case of the insured by Dr. McKinney, and there was no evidence of any brain lesion or any form of heart trouble with respect to the insured. Dr. McKinney, who had been her physician, testified that her heart was free from any ailment. The testimony of Dr. Davis, who did not see the body, was in effect only negative, and could not be said to have raised any issue for a jury as to whether or not the insured died from any cause other than strychnine poisoning. It could not reasonably be said that the letters giving direction as to the disposition of the body of the writer and of her property were not those of the deceased. They were found on the desk at the telephone exchange which the deceased operated, and were addressed to the local undertaker and to her brother and her sister. Near by on a bed was her body. There is not in the case the slightest suggestion that they were written by anybody else, or that her death was brought about by natural causes or accidental means. There is nothing to suggest that some one might have poisoned her and have written the letters to avert suspicion. All the physical facts and circumstances point only to self-destruction by a nervous, worried, and depressed woman. To hold otherwise would be to resort to the merest conjecture or surmise.

In *Gem City Life Insurance Co.* v. *Stripling,* 176 *Ga.* 288, 290 (168 S. E. 20), it was said: "The fact of suicide must be established by a preponderance of the evidence, but the presumption against it is not conclusive and will vanish upon proof of physical facts clearly inconsistent therewith. If the evidence adduced is such as to leave room for no other reasonable inference than that of suicide, the jury can not lawfully return a verdict to the contrary. . . Where all the testimony relating to a certain question excludes every reasonable inference but one, the issue is resolved into a question of law and may be determined by the court as such." In *New York Life Insurance Co.* v. *King,* 28 *Ga. App.* 607, 610 (112 S. E. 383), it was said: "The plaintiff offered no witness nor any evidence of any kind to show the cause of the death of Robert A. Coleman, or how the wound on him was inflicted, and it follows that the verdict rests solely upon the legal presumption

against suicide, and in the present case the only support for this presumption is mere conjecture which is unsupported by any evidence of any character. In the decision of the Supreme Court in the case of *Jenkins* v. *National Union*, 118 *Ga*. 587 (45 S. E. 499), it was said: 'We think it indubitable that when a contract of insurance provides that the policy shall be void in the event the insured shall commit suicide within a certain time, "whether at the time of committing suicide [the insured] shall be either sane or insane," the meaning is that, regardless of his sanity or insanity, the voluntary self-destruction of the insured within the time set out shall void the policy.' In *Travelers Insurance Co.* v. *Sheppard*, 85 *Ga*. 751 (12 S. E. 18), the presumption against suicide was stated thus: 'Where the fact of death is established, and the evidence points equally or indifferently to accident or suicide as the cause of it, the theory of accident rather than of suicide is to be adopted.' And it is universally held that the defense that the insured committed suicide must be established by a preponderance of the evidence, but that the presumption against suicide easily yields to physical facts clearly inconsistent with it. *Hodnett* v. *Ætna Life Insurance Co.*, 17 *Ga. App.* 538 (87 S. E. 813). The case last cited is very much like the one at bar in its facts and the inferences therefrom. Of course, if there is no evidence as to the cause of death, it will be presumed that the death is from natural causes. But the principle may be carried still further, and it may be regarded as a settled rule that, when the circumstances of the death are such that it might have resulted from negligence, accident, or suicide, the presumption is against death by suicide. This rule is stated [in 14 Cooley's Briefs on Insurance, 3255.] But it is well established that the fact of death by accident is not to be established by conjecture or presumption, unless there is no evidence whatever as to the cause of the death. The presumption of death by accident is prima facie only and is rebuttable, and, as said by several of the decisions, easily rebuttable by physical facts in evidence, and this presumption prevails only when the cause of the death is unknown. It does not prevail where there are facts bearing upon the question whether the death was intentional or accidental. When evidence is produced which is contrary to such a presumption, or the presumption is met by a conflicting presumption, it disappears, although the fact upon which it rests may still

remain proper to be considered in arriving at a conclusion. As was well expressed by the Court of Appeals of Missouri: 'Where the facts appear from which the issue of accident or suicide might be determined, then all presumptions, such as the love of living, and against suicide, are out of the case, and a plaintiff will not be entitled to recover and bolster up the case on such presumption where the facts of the tragedy are introduced in evidence.' Thompson v. Business Men's Accident Ass'n of America, 231 S. W. 1049. It has been repeatedly held by various courts, in discussing this question, that the issue as to the cause of death must be proved, like any other fact in a civil action, by a preponderance of the evidence on the question. Modern Woodmen of America v. Craiger, 175 Ind. 30 (92 N. E. 113, 93 N. E. 209). As stated in several cases on the point, the law does not prescribe any formula by which the hypothesis of accident must be removed; it is sufficient that it is met by evidence, where there are no facts or circumstances shown indicating accident or mistake, and facts and circumstances are shown which establish that the cause of death was suicide. 'Men do frequently commit suicide. It is one of the multitude of legitimate inferences, in which we infer the unknown from the known, having greater or less degrees of probability, which we use in reasoning to arrive at the ultimate fact. Being a probability based upon human experience, in its nature, it is controlling only in the absence of evidence of the actual.' Grosvenor v. Fidelity & Casualty Co., 102 Neb. 629 (168 N. W. 596). In other words, in its essential analysis the question we are discussing should be proved like any other fact. There should be nothing peculiar or exceptional in the method of proof. . . As against the mere conjecture, the slightest evidence of physical facts becomes strong, even conclusive." Certainly the physical facts and circumstances stated in the foregoing part of this opinion remove the presumption as to the love of living and against suicide, and require by their preponderances, and the absence of anything even remotely suggesting death by accident, natural causes, or the act of a third party, the conclusion that the insured came to her death as the result of the intentional taking of strychnine poison. The court erred in overruling the motion for new trial on the general grounds.

▮ The first special ground complains that the court erred in excluding from the jury the testimony of a witness (who had

stated that he refused to sell the insured some strychnine) that "I just felt like she wanted to kill herself." This statement amounted only to a belief on the part of the witness; and being prejudicial, as contended by counsel for the plaintiff in urging that it be stricken, was properly excluded by the court.

Another ground complains of an excerpt from the charge of the court which, it is contended, amounted to an instruction that the jury were not to consider any of the testimony of a certain witness on the question whether or not the insured took strychnine. This contention is without merit. Properly construed, as no doubt the jury understood it, the language to which exception is taken referred only to the excluded statement of the witness, a druggist, as to his belief that the insured "wanted to kill herself."

Several grounds complain that the court erred in stating the contentions of the defendant as to the cause of death of the insured, in that the court charged that it was the defendant's contention that the insured "intentionally committed suicide," whereas it is averred that the defense set up was that she intentionally took strychnine (as distinguished from an accidental taking), but was not limited to the contention that she was sane at the time of her act, but that there could be no recovery if she died by her own hand or act, whether sane or insane; that the court likewise erred in instructing the jury that "intentional suicide voids an insurance policy," and in other parts of the charge using the words "intentionally commit suicide," "intentional suicide," etc. The certificate provided that it should be void and of no effect "if the member holding the certificate . . should die . . by her own hand or act, whether sane or insane." "The words 'die by his own hand or act,' as used in a life-insurance policy, are in general synonymous with 'voluntary suicide,' and convey the idea of intentional self-destruction; but where with such words is coupled the provision 'whether sane or insane,' it is immaterial whether the insured at the time of the self-destruction was sane, or whether his 'mental faculties were so impaired as to destroy his moral responsibility.' [Citing.]" *Bullard* v. *Metropolitan Life Insurance Co.*, 31 *Ga. App.* 641 (2) (122 S. E. 75). However, the defendant did not in its answer fully avail itself of the defense it might have urged under the provision of the certificate, but set up that the insured "died on April 14, 1939, as the result of intentionally taking strych-

nine, and that the cause of her death was suicide by strychnine self-administered." The self-destruction of one who is at the time insane is not legally suicide. Mutual Life Insurance Co. v. Durden, 9 Ga. App. 797 (5) (72 S. E. 295). Hence, the contention of the defendant "that the cause of her death was suicide by strychnine self-administered" must be taken to mean that the insured was sane, as otherwise it could not be said that her act was "legally suicide." Of course, under the contract it would, as to non-liability of the defendant, be immaterial whether the insured was sane or insane if she intentionally took strychnine and died as a result thereof; but it is clear that the defendant limited its defense to the contention that she intentionally took strychnine but took it while she was sane, and thus by her act committed suicide. While the burden rested on the defendant to overcome by a preponderance of the evidence the presumption against suicide, it was not necessary for the defendant to prove that the insured was sane. The law presumes every person to be sane at the time of the commission of an act of self-destruction. Mutual Life Insurance Co. v. Durden, supra; Merritt v. Cotton States Life Insurance Co., 55 Ga. 103. The language of the court was not error for the reason urged by the plaintiff in error.

Another ground complains that the court erred in reopening the case and, over the protest of the defendant, allowing a witness for the plaintiff to testify after the case had been closed and motions argued by both parties for direction of a verdict, all of the witnesses for the defendant having been excused and having left the court, and being unavailable to the defendant. The case was reopened to permit a witness to testify for the purpose of explaining or rebutting certain statements made in the proofs of death. It is averred by plaintiff in error that one of its witnesses, who had been at court and could rebut the testimony of the witness for whose testimony the case had been reopened, had gone to her home in another county, was not under subpœna, and was not available after the reopening of the case. Counsel for plaintiff informed the court that he had no objection to counsel for the defendant stating in open court what the absent witness would testify if present; whereupon counsel for the defendant made a statement in that respect, still objecting, however, to the court's permitting the case to be reopened. It is stated, in effect, by counsel for movant

in their brief that they think the witness would have given more favorable testimony, if present, than counsel were willing to represent that she would; and it is contended that the court erred in reopening the case under these circumstances and permitting the plaintiff's witness to testify. In reopening a case for the introduction of additional evidence the trial judge is vested with a wide discretion, the exercise of which will not be disturbed except where it is manifest that such discretion has been abused. Counsel for the defendant was permitted to state fully what testimony might be expected from his absent witness. A mere opinion or surmise that the witness would have given, on behalf of the defendant, more testimony than counsel was willing to represent would be adduced does not show that the privilege granted counsel was not sufficient justification for the admission of the testimony of the plaintiff's witness. No abuse of discretion is shown, and this ground is without merit. *Judgment reversed. Felton, J., concurs specially.*

STEPHENS, P. J., dissenting. I can not concur in the conclusion of the majority that it appears conclusively, as a matter of law, from the evidence that the death of the insured was caused by her own act and was suicide, and that the verdict for the plaintiff is without evidence to support it. While it may be conceded that the evidence very strongly tends to establish the conclusion as a fact that the death of the insured was caused by her act in taking strychnine, and that I would draw the conclusion therefrom that the insured did commit suicide, I can not bring my mind to the conclusion that a jury could not, with reason, conclude that the defendant had not to the jury's satisfaction carried the burden resting upon it to show that the insured committed suicide. Under no theory could it be inferred that the insured committed suicide other than by taking strychnine into her stomach. There is no direct or positive evidence whatsoever that the insured took strychnine. The nearest to positive and direct testimony that the insured took strychnine and that her death was caused therefrom is the testimony of the attending physician, Dr. McKinney, that her death was produced by strychnine poisoning. This was the doctor's diagnosis and opinion, as he stated in his testimony. He stated that he came to this opinion from symptoms which he described. The only evidence tending to show that the deceased had possessed any strychnine was that of witnesses to the effect that after her

death strychnine was found in a bottle in a room where the insured lived across from the telephone exchange where she was when she died, and that a bottle containing some strychnine was found in her purse. These witnesses, except perhaps a druggist, who was one of the witnesses, testified as to the substance in the bottles being strychnine, as a conclusion drawn from the labels upon the bottles. The druggist testified, without reference to how his knowledge was acquired, that the bottle which was found in the insured's purse contained strychnine. It also appears from his testimony that before the death of the insured she had attempted to purchase from him some strychnine which she stated that she desired to use to kill something that was bothering her chickens. There appear from the evidence many extrajudicial statements of various witnesses, including the statement of the plaintiff to the effect that the insured's death was suicide and caused from strychnine poisoning. None of these statements have any conclusive probative value. In fact all of them are hearsay and have no value whatsoever, with the possible exception of the statement to the above effect, made extrajudicially by the plaintiff. The effect of such statement is no more than an admission the probative value of which would be for the jury. It certainly does not establish conclusively the fact of suicidal death by strychnine poisoning.

The authenticity of letters, the contents of which were in evidence, purporting to have been written by the deceased, and which it is contended authorized the inference that the insured committed suicide, were established only by inference. Their contents, even if established as being statements made by the insured evincing a suicidal intent, do not conclusively establish the fact of suicide. At best the contents of such letters are mere circumstances which, when taken with other circumstances in the case, might have some probative value with the jury. This is also true as respects any other statements or acts of the deceased which might be in evidence, tending to show a suicidal intent. While it is true, as stated in the majority opinion, that the legal presumption against suicide vanishes upon the introduction of evidence of facts and circumstances tending to show the cause of the death, the fact upon which the presumption rests, which is that a person loves life better than death, may be considered by the jury to all intents and purposes as if it were an evidentiary fact. Such fact is not eliminated

574

from evidence and as having probative value for consideration by the jury until the evidence absolutely and conclusively establishes suicide and thereby destroys any probative value which the fact that a person loves life better than death may have as tending to establish the fact that the death was not suicidal. I do not think the probative value of this fact has, in view of the fact that there is no positive proof that the death of the insured was caused from suicide or from taking strychnine poison, been eliminated, but that the inference that the death of the insured was so caused is only derived from circumstances. See in this connection *New York Life Insurance Co.* v. *Ittner,* 59 *Ga. App.* 89, 92 (200 S. E. 522); *New York Life Insurance Co.* v. *King,* 28 *Ga. App.* 607, 610 (112 S. E. 383); *Pilot Life Insurance Co.* v. *Wise,* 48 *Ga. App.* 540 (173 S. E. 252). I am therefore of the opinion that the evidence does not demand a finding that the death of the insured was the result of suicide from her having taken strychnine, and a ruling that the verdict for the plaintiff was not authorized, but that a verdict for the defendant was demanded. I am of the opinion that the verdict for the plaintiff was authorized, and that, as indicated by the majority opinion, no error of law otherwise appears. I am of the opinion that the judgment should be affirmed.