30217. NEW YORK LIFE INSURANCE COMPANY *v.* DUTTON.

Decided March 16, 1944.

*Bryan, Carter & Ansley, Owen & Gross, Hammond Johnson,* for plaintiff in error. *Wheeler, Robinson & Thurmond, C. M. Mc-Clure, George L. Goode,* contra.

BROYLES, C. J. (After stating the foregoing facts.) The evidence demanded a finding on the following facts: The insured had operated a store in Toccoa, Georgia, for many years. In March, 1940, because of bad health, he sold the store, and was greatly depressed about having to give up his business and about his physical and mental condition. While he was conducting said business he lived at the hotel in Toccoa and roomed with a friend, W. B. Jones. After selling out the business, he moved to Fairburn, Georgia, and lived with said Jones and Jones's wife from March, 1940, until October, 1940. During that time he was greatly distressed and despondent about his health and having nothing to do. In October, 1940, being a veteran of the first World War, he went to the Veterans Hospital No. 48, in Atlanta, where he remained until January, 1941, when he returned to Toccoa. In the spring of 1941, his condition improved; but in June of that year it began to worsen, and he again grew despondent about his future. For sometime he had been engaged to marry Miss Reba Lawson, of Gainesville, Georgia, who taught school in Toccoa. She visited him regularly while he was living with the Joneses and while he was in the hospital. When he returned to Toccoa, she saw him almost every day. He wanted to marry her, but was unwilling to do so on account of his health and his inability to support her. He was divorced from his wife several years before his death, and she and his daughter (the plaintiff in this case) lived together in Toccoa. On Sunday, August 10, 1941, he telephoned Miss Lawson (who was then in Gainesville on vacation) and told her he was sick, and asked her to come to Toccoa to see him. She went to Toccoa and spent the day with him, and on that visit he told her he wanted to go to Atlanta to see a doctor. He was so distressed and despondent that she brought him back to her home in Gainesville. On the next day she drove him to Atlanta to consult Dr. W. W. Young, a specialist in psychiatry and neurology. Dr. Young's examination disclosed that the insured was in a very serious condition—that he was depressed, with a general attitude of hopelessness, and with a great amount of worry over his condition. The doctor advised hospital care for his adequate treatment and

protection. He made an appointment at the time to see Dr. Young again on August 14 (the day before his death), but failed to keep it. He and Miss Lawson returned to her home in Gainesville, and he became more depressed and despondent. On several occasions on the day of his death and on the day before, he said: "I can't keep on staying here; I don't feel like I can go back to Toccoa; and I don't know what I am going to do." And, at several other times, while he was at Miss Lawson's home, during the two or three days preceding his death, he said: "Something has got to be done for me, or else." Miss Lawson and her family tried to cheer him up, but failed to do so. On the day of the insured's death, Carl Lawson, a brother of Miss Reba Lawson, went bird-hunting with a short-barreled twelve-guage double-barreled shotgun. He and the insured slept in the same room on this visit of the insured. Lawson returned from hunting about noon, and put the gun on his bed, with some of the cartridges which he had taken from his pocket. He left the gun *unloaded,* and went to a baseball game. Later that afternoon, Reba Lawson drove her mother to a doctor's office. She left the insured in a swing on the front porch. When she returned in about thirty minutes, he was not on the porch. She looked for him in the house, but failed to find him. She went to the back part of the house and called him and then heard a shot in the basement. The only entrance to the basement was from the outside of the rear of the house. She looked through the basement window and saw that the insured had shot off the top of his head. She telephoned members of her family who called a doctor, the coroner, and the undertaker. The coroner's jury found that death was caused by gunshot wounds which were self-inflicted. The body was found in a partly sitting position in an overturned chair, the back of the body being against the back of the chair, and the legs hanging over the rungs on the front of the chair. The shotgun (which Carl Lawson had left unloaded on his bed) was found with its barrel leaning on the rungs of the chair. The muzzle was pointed towards the body of the insured. The gun contained one cartridge which had been fired. Powder burns were found on the index finger of the left hand, indicating that the insured had held the muzzle in his left hand before firing the gun. The gun was equipped with a safety catch in good working order, and the gun could not be fired by a slight touch on the

trigger, even if the safety were off, but required some pressure upon the trigger. An imprint of the butt of the gun was on the dirt floor directly in front of the chair. The evidence further showed that a few months before the death of the insured, one of his sisters had killed herself with a pistol shot, and that this act had prayed upon his mind. The above-stated evidence was uncontradicted, and most of it was given by his dearest friends, Miss Reba Lawson and Mr. and Mrs. W. B. Jones.

It is admitted in the petition that the insured killed himself by firing a load of shot into his head; but the plaintiff contends that he shot himself accidentally, and relies upon the presumption against suicide. It is true that "the presumption against suicide will stand and be decisive until overcome by testimony outweighing it." *Standard Insurance Co.* v. *Kiker,* 45 *Ga. App.* 706 (165 S. E. 850). However, the presumption against suicide in the instant case was completely overcome and eliminated by the uncontradicted evidence adduced. In addition to the other evidence, the presumption was overcome by the undisputed physical facts of the killing. These facts indicate, to the exclusion of every other reasonable theory, that the insured had seated himself in the chair, had placed the butt of the gun on the dirt floor of the basement, had held the muzzle of the gun close to his head with his left hand, and with his right hand had pulled the trigger and blown off the top of his head. There was no evidence whatever suggesting or indicating that the killing was accidental. The theory of accident was a mere conjecture, unsupported by any evidence. In *Gem City Life Ins. Co.* v. *Stripling,* 176 *Ga.* 288, 290 (168 S. E. 20), where the facts were somewhat similar to those of the instant case, the court said: "The fact of suicide must be established by a preponderance of the evidence, but the presumption against it is not conclusive and will vanish upon proof of physical facts clearly inconsistent therewith. If the evidence adduced is such as to leave room for no other reasonable inference than that of suicide, the jury can not lawfully return a verdict to the contrary. . . Considering the location and range of the wound, together with the facts that powder burns were found upon the scalp and also upon the fingers of both hands of the insured and that the pistol was discovered near his body with one cartridge discharged, we think there was no room for an inference that the insured accidentally shot

himself. The facts as thus stated, standing as they do without explanation, point only to a contrary solution, and therefore conclusively rebut any presumption that the insured shot himself accidentally. . . Under the facts of the present case all of the probabilities are one way, pointing to and consistent with the theory of suicide, and inconsistent with any other theory or hypothesis. Other explanations which may occur to the mind will not bear the test of reason and probability, and must be discarded as mere products of the imagination. Where all of the testimony relating to a certain question excludes every reasonable inference but one, the issue is resolved into a question of law and may be determined by the court as such. . . The verdict in favor of the beneficiary was contrary to the evidence, and as a matter of law unauthorized. For this reason, the court erred in refusing a new trial." The ruling and its language in that case are applicable and pertinent to the facts of this case. See also, to the same effect, *New York Life Ins. Co.* v. *King*, 28 *Ga. App.* 607 (112 S. E. 383), and *Supreme Forest Woodmen Circle* v. *Newsome*, 63 *Ga. App.* 550 (11 S. E. 2d, 480). The cases cited in behalf of the defendant in error are differentiated by their facts from this case.

The verdict was contrary to law and the evidence, and the court erred in denying a new trial. As this ruling is controlling in the case, the special grounds of the motion for new trial are not considered.

*Judgment reversed. MacIntyre and Gardner, JJ., concur.*