15201

OWENS v. OCEAN FOREST CLUB, INC., *ET AL.*

(12 S. E. (2d), 839)

The order of the lower Court, requested to be reported, follows:

Horace Owens, late of the county and State aforesaid, was employed by Ocean Forest Club, Inc., at Myrtle Beach as game warden in charge as such of a large area of land leased and used by the club for a game preserve; his duties,

among other things, requiring him to patrol the land to prevent poaching and other trespasses. He died on the 16th day of November, 1938, the immediate cause of his death being a bullet wound through the head. The body was found on what is referred to in the testimony as Bear Swamp Trail, or Bear Branch Trail, a path or walkway which runs through the wooded premises. There is undisputed evidence that he entered upon the property for the performance of his duties some time in the morning of that day, and his body was found at the place mentioned during that afternoon.

His widow, Mrs. Ruth Owens, filed a claim for compensation under the Workmen's Compensation Act, Act July 17, 1935, 39 St. at Large, page 1231, and liability being denied, a hearing was held by Commissioner John H. Dukes, on May 13, 1939, at which hearing a considerable volume of testimony offered by the respective parties was taken. On June 14, 1939, Commissioner Dukes filed his order awarding compensation, whereupon the defendants applied for a review by the full commission, which held a hearing on August 14, 1939; and on September 2, 1939, the majority of the commission, speaking through Commissioner Martin, affirmed the findings of fact and conclusions of law of hearing Commissioner Dukes and sustained his award.

The case comes to the Court upon an appeal by the defendants from this award of the South Carolina Industrial Commission, based on five exceptions. The appeal was very ably and elaborately argued before me by counsel for the respective parties at my chambers at Marion on November 10, 1939, and the preparation of this order has been delayed far longer than was intended, but the record is somewhat voluminous and the questions involved close and difficult.

While, as above stated, there are five exceptions, it may be observed that the main questions are raised by Exceptions 2 and 3, both of which involve a careful consideration and review of the testimony in the case,

especially with regard to the cause of the death of Horace Owens. Hence, we must first have in mind the function of the Court in an appeal of this kind. The rule is so aptly stated by Mr. Justice Fishburne in the rather recent case of *Rudd v. Fairforest Finishing Co.*, 189 S. C., 188, 200 S. E., 727, 728, that a rather long quotation from the opinion in this case seems appropriate. It is as follows: "It is a familiar formula that findings of fact by a Board or Commission on a claim under a Workmen's Compensation Act are conclusive; and the appellate court will not review such findings except to determine whether there is any evidence to support the award. It may reverse an award if there is an absence of any evidence to support it, but it is not a trier of facts. If the facts proved are capable as a matter of law of sustaining the inferences of fact drawn from them by the Board, its findings are conclusive in the absence of fraud, and neither this Court nor the Court of Common Pleas is at liberty to interfere with them. This is but an application to Workmen's Compensation cases of the fundamental principle universal in Courts of law, that whether there is any competent evidence is for the Court to determine, but whether the evidence is sufficient is a question for the jury; the function of the Commission being in that respect that of a jury in actions of law. While the findings of fact by the Industrial Commission will be upheld if there is any evidence on which it can rest, it must be founded on evidence, and cannot rest on surmise, conjecture or speculation."

In the still more recent case of *Ham v. Mullins Lumber Co.*, 193 S. C., 66, 7 S. E. (2d), 712, reference is made in the order of the Circuit Judge, which was approved by the Supreme Court, to the language of Circuit Judge Sease in the case of *Spearman v. Royster Guano Co.*, 188 S. C., 393, 199 S. E., 530, 532, as follows [193 S. C., 66, 7 S. E. (2d), 719]: "That the courts have jurisdiction to review awards of the Industrial Commission only where there is no substantial evidence to support the findings of fact of the Com-

mission, or, in other words that the court has jurisdiction identical with the jurisdiction of the Supreme Court in jury cases in determining whether a verdict should have been directed."

And in the case of *Phillips v. Dixie Stores, Inc., et al.,* 186 S. C., 374, 195 S. E., 646, 647, the Court held that the Circuit Judge was in error in considering "whether the conclusions of the commission have adequate support in the evidence." As the Court said: "This is just what he is forbidden to do. If there were absolutely no evidence in support of the findings of fact by the commission, we might say that the question thus becomes a question of law. But whether there is a sufficiency of evidence is strictly a matter of fact, and the findings of the commission thereabout are final."

In considering therefore the findings of fact by the commission in the case at bar I am in very much the same position I would have been if the case had been tried before me as presiding Judge and a jury. The commission as a fact-finding body stands practically in the same position of a jury and its findings and conclusions are binding unless the evidence is such that the Court would have directed a verdict to the contrary.

Exception 2, which should first be considered, is: "There is .no satisfactory evidence that the deceased came to his death by an injury arising out of and in the course of his employment."

The use of the word "satisfactory" is not entirely appropriate here because that would more aptly relate to the weight of the evidence. But waiving that perhaps rather hypertechnical criticism of the exception, it is quite true that under the terms and provisions of the Workmen's Compensation Act, the claimant or plaintiff would not be entitled to compensation unless the death of Horace Owens occurred "by accident arising out of and in the course of the employment." Subdivision (f), Section 2. Moreover the burden would be upon the plaintiff to show

that the case comes within this provision of the law. And at this point it should be stated that all of the evidence relating to the cause of the death of Horace Owens is circumstantial in character. But as is said in 71 C. J., 1085-1086: "Circumstantial evidence may be sufficient to support a finding of fact or an award, and a finding or award may be based on inferences drawn from circumstantial evidence; the evidence need not, although it may, be direct or positive. Circumstantial evidence, to establish a claim, need not reach such a degree of certainty as to exclude every reasonable or possible conclusion other than that reached."

The evidence is clear that at the time of his death Horace Owens was on the company's property during the hours of his employment, and that he was found dead from a gunshot wound at a place where his duty may have required him to be.

And there is a natural presumption, or a presumption of fact, that one charged with the performance of a duty and injured while performing such duty, or found injured at a place where his duty may have required him to be, is injured in the course of, and as a consequence of, the employment. 71 C. J., 1060.

In the case of *Standard Accident Ins. Co. v. Kiker*, 45 Ga. App., 706, 165 S. E., 850, 851, the Georgia Court of Appeals said: "So where a night watchman is found dead in a place where he might reasonably be expected to be in the performance of his duties, the natural presumption arises that his death occurred out of and in the course of his employment."

In the North Carolina case of *Goodwin v. Bright*, 202 N. C., 481, 163 S. E., 576, 577, it was held that where the evidence showed that an employee, to wit, a fireman, while performing duties as such at a planing mill, was shot and killed by a robber, he met his death by accident arising out of his employment, and that his death under those circumstances not only arose "in the course of" but "out of" his employment, the same resulting from a

hazard or risk that was incidental to the nature of the service. Bearing these principles in mind, I am of opinion that it may be reasonably inferred from the evidence that a *prima facie* case was made out to the effect that the deceased came to his death "by accident arising out of and in the course of the employment," and that compensation should be allowed unless the death of the employee was occasioned by his willful intention to injure or kill himself. And under the terms of Section 13 of the Workmen's Compensation Act the burden of proof in this particular rests upon the defendants herein; which brings us to the consideration of the most important question raised by this appeal, to wit, Exception 3, which is: "The only reasonable inference to be drawn from the testimony is that the deceased came to his death by suicide."

This exception correctly suggests that the question before the Court is not whether the weight of the evidence supports the theory or defense of suicide, but whether that is the only reasonable inference to be drawn therefrom. Let us then review the testimony, stating some of the high lights thereof.

At the point where the body of the deceased was found there is an old live oak tree with a long limb extending horizontally near the ground and making a natural and convenient seat for one using the Bear Branch Trail through the woods. Leaning against this tree was the rifle carried by Horace Owens. It was leaning in a practically upright position with the muzzle sticking in the ground. On or near the natural seat on the tree were stubs of three cigarettes which had evidently been extinguished by mashing them. There were also some matches and a loaded rifle shell. The body was lying prone on the ground a short distance from the tree, there being some conflict in the testimony as to the exact distance, but some of the witnesses testified that the head of the deceased was thirteen feet eight inches from the point where the rifle was leaning against the tree.

There was a bullet hole extending through the head of the deceased. Dr. F. A. Brunson, a physician practicing at Myrtle Beach, examined the body of Horace Owens shortly after it was discovered, and he testified that he found a bullet wound approximately two inches above the lobe of the right ear, which apparently was the bullet entrance, on the right-hand side of the skull, and the exit was found upward and oblique on the opposite side of the skull about five inches above the lobe of the left ear. He also testified that the skull was dark and disclosed a circular redness or erythema at the point of entrance, this being approximately the size and contour of the barrel of the rifle. Dr. Brunson further testified that he inserted in the wound a bullet from a cartridge fitting the barrel of the rifle and from the way it fitted in the wound it was his conclusion that a bullet of that character must have caused the injury. He further gave it as his opinion that the wound was self-inflicted.

Dr. H. H. Plowden, an expert pathologist, also testified in behalf of the defendant. The body of Horace Owens was exhumed, and this witness performed an autopsy thereon on March 5, 1939. He testified that his examination showed that the point of entrance of the bullet was in the right temple region on the right side of the head one inch above the lobe of the right ear and a half inch in front, and that the wound indicated that the muzzle of the gun was in contact with the skin at the time the bullet was fired. The bullet ranged upward and the fractured pieces of the skull were forced outward instead of being crushed inward, and it was the opinion of this physician that this condition would not have been possible if the weapon had been some distance removed from the skull. He further testified that it was his opinion that the shot was fired at very close range, "practically in contact with the scalp."

Dr. Plowden further testified that while he could not be accurate, it was his opinion that with a brain injury of this character a man would live long enough to give three, four, or possibly five very sharp, severe convulsive jerks and be

dead possibly thirty seconds to a minute thereafter. He said that *he thought a man would drop where he was,* that he might fall and jerk and lunge that far, but he certainly could not walk, thirteen feet. The deceased was a man five feet eight or nine inches tall.

Mr. John R. Pierczynski, identification officer for the Charlotte Police Department, and a ballistic expert, also testified for the defendants. He was present at the autopsy, and his testimony is to the effect that it was his opinion that the barrel of the gun was in direct contact with the head of the deceased at the time it was fired, and that he based his opinion upon tests that he had conducted with this weapon. He further stated that he had found gunpowder in a portion of the tissue delivered to him for chemical analysis. He further testified that he had made a test indicating that there was blood on the rifle, but he frankly admitted that he did not subject the blood to such a test as to be able to say whether it was human blood or not. He also stated that he endeavored to "re-enact" the occurrence as he had concluded it happened and that the rifle fell in the same position as it was found by those first viewing the scene.

Without going further into the details of the expert testimony, it may be said the defendants contend therefrom that this scientific evidence establishes suicide, and that to hold otherwise is to indulge in speculation and conjecture. And in further support of this conclusion they offer testimony that Horace Owens had on several occasions, some rather remote in time and others of a recent date, made statements indicating that he contemplated self-destruction; but an examination of all of this testimony will show that these statements were made when he was more or less under the influence of intoxicants, and do not seem to have been treated very seriously by the persons to whom they were made. While on the other hand the widow testified that he was happy and that they lived happily together, and that she never heard any suggestion from him that he contemplated taking his own life. It would further appear from

some of the testimony that he loved the woods in which he worked and that his employment was congenial to him. And the witness, J. F. Hamilton, who was engaged in similar employment, says that he often talked with the deceased, who spoke of the hazards of his calling and (quoting from the testimony) "he told me he knew that he had some pretty close calls in the woods and in fact for me not to be surprised at any time he would be found." This witness construed the remark as having no reference to suicide but to the nature of the work, which he said, "is more dangerous than regular police work, in my experience."

There was also testimony that there was a little diary kept by the deceased which was found in his truck. The book was given to Sam K. Owens, of the police department of Myrtle Beach, an uncle of the deceased, who testified at the hearing that he did not know where it was although he admitted that while he had loaned it to a Mr. Benton, according to his recollection it had been returned. He said that there was an entry in the book to this effect: "In case I come up missing look this little book over." He testified that he found no statement in the book to the effect that "if I am missing or cannot be found you can find me on the Bear Swamp Trail"; but later in his testimony admitted that something similar to this was in the book.

Other witnesses testified as to the contents of the book, one of them being Ellis Owens, a cousin of the deceased, who said that he saw the book about a week or ten days before the death of Horace, and that it said "Look for me in the Bear Branch section," and that this was signed.

Mrs. Beulah Oglesby testified that she found the little book in the truck and gave it to Sam Owens; that on the first page of the book, which was dated September, 1938, it said in case he came up missing look this little book over carefully, and that the book was a sort of diary.

Mr. Sam K. Owens does not give a very satisfactory explanation as to the loss of the book, but in view of his testimony evidence as to its contents,

it seems to me, was competent, although the commission considered it hearsay. However, the statements therein contained according to the testimony are rather cryptic, and the precise language used is unknown.

The defendants also lay stress upon what they deem to be evidence of a strong motive for suicide. It appears from the testimony that the deceased had permitted one J. B. Chestnut to erect and operate an illicit still upon the premises of Ocean Forest Club, Inc., Chestnut promising to pay Owens the sum of two or three dollars a week "hush money" for this illegal privilege, and he says that Owens first agreed to this and borrowed $10.00 against it, but later said he would return the $10.00 and would make no charge. It so happens that on the day Owens died Chestnut was arrested on account of the still, the same having been discovered, and furthermore that Horace Owens saw Chestnut while the officers had him in custody on that very morning. This might have some significance, but there is no direct evidence that the arrest of Chestnut was disturbing to Owens, and it might well be inferred that Owens was confident that Chestnut would not disclose his misconduct. Indeed, Chestnut testified: "Horace knew me well enough that I would not say anything."

But giving full consideration to all the testimony in the record which might be logically construed as pointing toward suicide, it is my conviction, after a somewhat prolonged and extensive study of the record, that this is not the only reasonable inference which may be drawn from the evidence. There are at least three major circumstances repugnant to the self-destruction theory:

*First: There is testimony that the deceased was a left-handed man,* whereas there is no doubt of the fact that he was shot on the right side of the head. J. F. Hamilton, who had been Chief of Police at Myrtle Beach, testified that Horace Owens was "definitely left handed," and that he shot from the left shoulder with a rifle; that he always shot a rifle from his left shoulder. Ellis Owens also testified

that he was left handed. W. M. Todd testified that he was left handed in a way, "he was left handed or right handed." He said further: "He used his left hand first, if he could not use his left hand first he would use his right." This is certainly a circumstance tending to refute the view that the wound was self-inflicted. If, as this evidence shows, the deceased ·was left handed it seems that it would have been unnatural and quite improbable for him to·have shot himself in the position indicated by the wound in his head.

In the case of *Sanders v. Commonwealth Life Ins. Co.,* 134 S. C., 435, 132 S. E., 828, one of the circumstances which was mentioned as militating against the theory of suicide was that there was evidence that the deceased was a right handed man while the powder burns were on the left hand.

*Second: The position of the body.* There were two photographs taken for the purpose of indicating the position of the rifle and the position of the body of the deceased. One of these pictures was based upon testimony to the effect that the feet of the body were three or four feet from the rifle. This picture is marked Exhibit B. The other picture is based upon the testimony that the distance was thirteen feet eight inches from the head to the rifle, and this picture is marked Exhibit H. Captain Sam K. Owens testified that the head was thirteen feet and eight inches from the gun. Members of the coroner's jury also stated that Exhibit H appeared to them to be more nearly correct. As one of them testified: "That is the way it looked to me when I got there." Another one testified that his estimate was that the head was from fourteen to sixteen feet from the gun. J. F. Hamilton, who testified for the plaintiff, also said that he was present at the time the distance from the man's head to the rifle was *measured, and that it was thirteen feet eight inches by steel tape.* The evidence then was certainly ample to justify the commission in concluding that Exhibit H more correctly indicated the position of the body, and if so this would be a circumstance tending to refute the theory that

the deceased killed himself with the rifle. The speculation that the body might have been projected that far by the jerks consequent on the wound appears to be rather incredible. It is true there was also evidence of some declivity, or at least a downward grade, but if the body had slided or rolled down the grade it may be inferred there would have been some indication thereof on the ground, although it was covered with leaves and straw, and the witnesses all agree that there was no evidence of any sort of disturbance in the terrain. Moreover, there was no testimony that any blood was found except on or under the head of the deceased where the body lay, which would seem to be a very significant circumstance. J. R. Gore, a witness for the defendants, said: "There was no evidence of any blood that we could find other than under his head, and a little on the opposite side where the bullet went in." And in answer to the question: "Which would clearly show that after the bullet went in there, the head did not move from that point?" He testified: "There was no sign of any blood or any disturbance that I could see."

*Third: What bullet caused the death of Horace Owens?* The hearing commissioner stated in the opinion rendered by him, as one of the reasons for his conclusion, that the bullet causing the wound had never been identified, and this inference has some support in the testimony, although the evidence shows that there was an exploded shell in the rifle, and the theory of defendants is that this was the shot that caused the death of the deceased. One H. W. Barnes, a witness for the plaintiff, testified that some time in January they looked for the bullet and that he found it "just about twenty inches above where it was pointed out to him the head was," and that the bullet was about four inches in the ground. The bullet alleged to have been found by him, and which was introduced in evidence, was called a "38-special," and according to the testimony is not the kind of bullet that was in the rifle of Horace Owens, but was of somewhat larger caliber. It will be recalled that

Dr. Brunson testified that he inserted a bullet of the kind used in the rifle in the wound and that it fitted so well that his conclusion was that such a bullet actually inflicted the wound, but it would seem to be a mere matter of common sense observation that the precise caliber of the bullet cannot be determined from the size of the wound with entire accuracy. This is sufficient to indicate that the test made by Dr. Brunson could not be deemed to be in anywise conclusive. And the same may be said of the opinion of Mr. Pierszynski, the ballistic expert, that the "38-special" bullet did not cause the wound because it appeared to be too nearly intact. Certainly the evidence relating to the bullet was entirely competent and affords support for the findings of the commission.

As I have already stated, the burden of proof is on the defendants under the terms of Section 13 of the Workmen's Compensation Act to show that the death of Horace Owens was occasioned by his willful intention to kill himself. This section provided that: "No compensation shall be payable if the injury or death was occasioned by the intoxication of the employee or by the willful intention of the employee to injure or kill himself." And it is further stated: "The burden of proof shall be upon him who claims an exemption of forfeiture under this Section."

As above indicated, my opinion is that it cannot be said that the only reasonable inference to be drawn from the testimony in the case at bar is that the deceased came to his death by suicide, or in the language of the statute, "willful intention to kill himself." Nor can the conclusion reached by the commission be deemed to be based upon speculation, conjecture or surmise, as charged in Exception 1, but has a sound basis in the evidence.

The fourth exception complains that the hearing commissioner and the full commission committed error in giving consideration and effect to the testimony taken before and the verdict of the coroner's jury. So far as any testimony taken before that body is concerned,

it appears to have been used only for the purpose of contradiction. And the verdict of the coroner's jury was merely mentioned incidentally by the hearing commissioner, and was accorded no significance by me.

The fifth exception complains that error was committed in allowing the plaintiff to introduce evidence in reply, which defendants contend was a part of her original case. In view, however, of the affirmative character of the defense of suicide, I do not think that it can be logically said that this evidence, or a substantial portion thereof, was not in reply; but aside from this, a matter of this kind was necessarily in the discretion of the hearing commissioner, and I do not think his discretion was abused.

All of the exceptions are overruled, and the award of the South Carolina Industrial Commission is hereby affirmed and made the judgment of this Court.

*Messrs. Wright & Burroughs,* for appellants,

*Messrs. G. Lloyd Ford* and *J. M. Long,* for respondent,

January 14, 1941.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

A careful consideration of the record in this case convinces us that the lower Court correctly disposed of all the issues presented by the appeal, and we adopt its decree as the judgment of this Court. Let the decree be reported.

Judgment affirmed.

MR. CHIEF JUSTICE BONHAM and MR. JUSTICE BAKER concur.

MR. JUSTICE STUKES did not participate in the consideration or decision of this case.